IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FREDERICK WASHINGTON,

Plaintiff,

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY, et al.,

Defendants.

CIVIL ACTION
NO. 19-4213

**OPINION**

**Slomsky, J.**                                                        **June 28, 2021**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 3

      A.  Plaintiff's Employment with SEPTA ........................................................ 3

          1. Conflict Between Plaintiff and Defendant Drayton in 2017 ....................... 3

          2. Defendant Singleton Becomes Involved in the C Tour Conflict ................. 5

          3. Conflict Between Plaintiff, Drayton, and Singleton Continues in 2018 .................... 7

          4. Defendant Jakira Jones Becomes Involved in the C Tour Conflict ............................ 11

          5. Resulting Discipline ................................................................................. 13

          6. Plaintiff Files Formal Complaint Followed by New Allegations
             of Wrongdoing by Drayton .................................................................... 15

          7. Plaintiff Serves His One-Day Suspension, Resigns, and Files Complaint
             with the EEOC and PHRC ..................................................................... 18

      B.  The Instant Case .................................................................................... 20

          1. Defendants' Motion for Summary Judgment ............................................ 22

|  | 2. Plaintiff's Response in Opposition to the Motion | 26 |
|  | 3. Defendants' Reply | 27 |

| III. | STANDARD OF REVIEW | 28 |

| IV. | ANALYSIS | 28 |

| | A. Race Discrimination under Title VII and the PHRA | 29 |
| | 1. Denial of Training | 32 |
| | 2. Administrative Warnings | 33 |
| | 3. Suspension Without Pay | 35 |
| | 4. Denial of a Transfer | 38 |
| | 5. Constructive Discharge | 39 |

| | B. Hostile Work Environment under Title VII | 43 |
| | 1. Severity | 45 |
| | 2. Pervasiveness | 46 |

| | C. Retaliation under Title VII and the PHRA | 49 |
| | 1. Protected Activities | 52 |
| | 2. Causal Connection Between Protected Activity and Adverse Action | 55 |

| | D. Aiding and Abetting under the PHRA | 58 |

| | E. Claims under Section 1981 | 62 |
| | 1. Defendants SEPTA, Drayton, Singleton, and Jakira Jones Are Not Liable under Section 1981 | 62 |
| | 2. Defendants Boring, Gritsko, and Captain Jones Did Not Violate Section 1981 | 65 |

| V. | CONCLUSION | 67 |

# I.     INTRODUCTION

Plaintiff Frederick Washington is a mixed-race individual who worked as a Transit Police Dispatcher for the Southeastern Pennsylvania Transportation Authority ("SEPTA") from August 2017 to June 2019.  Throughout his employment, Plaintiff complained numerous times to his supervisors about the conduct of three African American coworkers that he believed was racially discriminatory and created a hostile work environment.  In the myriad of complaints, however, race-related conduct only was implicated when Plaintiff complained about things he overheard, specifically: (1) two coworkers using the word "mulatto" in conversation, (2) a coworker muttering "light skin privilege" under her breath, (3) a coworker using the N-word in conversation, (4) coworkers talking about their dating preferences based on skin tone, and (5) coworkers telling jokes Plaintiff felt were discriminatory and offensive.  Otherwise, Plaintiff's complaints concerned work-related altercations and disagreements with the three coworkers, some of which included vague, conclusory allegations of race discrimination.

Notably, the same coworkers Plaintiff complained about also complained to supervisors about Plaintiff.  One coworker filed two complaints—in one he wrote that Plaintiff called him the N-word during an altercation, and in another he described Plaintiff's attitude as "uncooperative," and that Plaintiff loudly stated he worked with "pieces of sh*t."  Another coworker wrote that she criticized Plaintiff for not doing his job and recounted the conflict that ensued when she confronted him about it.

Each time a supervisor received an informal complaint from Plaintiff or his coworkers, SEPTA launched an internal investigation of the allegations to determine whether anyone involved violated SEPTA policy.  In December 2018, after a third incident where SEPTA found Plaintiff engaged in inappropriate workplace behavior, SEPTA's independent Police Board of Inquiry issued Plaintiff a one-day suspension without pay pursuant to its Progressive Discipline Scale.

Plaintiff disputed the suspension through various grievance hearings.  In March 2019, while the suspension dispute was ongoing, Plaintiff filed a formal complaint with SEPTA's Equal Employment Opportunity ("EEO") Department, alleging that he was discriminated against and subjected to a hostile work environment by the three coworkers.  In May 2019, Plaintiff's suspension was upheld, and in June 2019, Plaintiff resigned.  At the time of his resignation, SEPTA had not yet completed its investigation into his EEO complaint.

In September 2019, Plaintiff initiated this case against SEPTA, his three supervisors—Michael Boring, Michael Gritsko, and Captain Daryl Jones—and the three coworkers—Richard Drayton, Denise Singleton, and Jakira Jones.  In the Complaint, Plaintiff alleges that coworkers Drayton, Singleton, and Jakira Jones discriminated against him on the basis of his mixed race and their conduct created a hostile work environment.  He further avers that when he complained to supervisors Boring, Gritsko, and Captain Jones, they did not investigate his discrimination allegations; rather, he received a one-day suspension without pay for complaining.

In December 2020, Defendants filed the Motion for Summary Judgment that is presently before the Court.  (Doc. No. 27.)  In the Motion, Defendants assert that Plaintiff's claims fail as a matter of law because they either lack evidentiary support or are made against parties who cannot be held liable.  They characterize Plaintiff's allegations as interpersonal bickering and workplace squabbles that had nothing to do with race, and maintain that Plaintiff was suspended for violating SEPTA policy by engaging in inappropriate workplace behavior.  As such, they ask that summary judgment be granted in their favor on the ground that the entire case is baseless, lacks evidentiary support, and there are no triable issues.  In Plaintiff's Response in Opposition, he maintains that a review of the entire record shows that he was subjected to race discrimination, a racially hostile work environment, and retaliation.

For the reasons discussed <u>infra</u>, Defendants' Motion for Summary Judgment (Doc. No. 27) will be granted.

## II.    BACKGROUND

### A.    Plaintiff's Employment with SEPTA

On July 27, 2017, SEPTA offered Plaintiff Washington employment as a Transit Police Dispatcher[1] with the SEPTA Police Department, which Plaintiff accepted.  (<u>See</u> Doc. No. 28, Ex. 1.)  Plaintiff, who is African American, Hispanic, and Caucasian, and identifies himself as "mixed race,"[2] began his employment in August 2017 and soon after was assigned to work the "C Tour"[3] shift alongside dispatchers Richard Drayton, Denise Singleton, and Jakira Jones, who are all African American.  (<u>See</u> Doc. Nos. 27 at 11; 27-1 ¶ 2; 28, Ex. 2 at 123:23; 32-2 ¶ 2; 33, Ex. A at 40:2-8.)  The C Tour shift was from either 2 to 10 p.m. or 3 to 11 p.m. and was considered by many to be the least desirable shift.  (<u>See</u> Doc. No. 33, Exs. A at 40:21-41:4; H at 29:9-18; J at 11:7-8.) Supervisor Michael Gritsko described C Tour as "[a] different kind of stress. . . . The people on C Tour . . . were overworked, they [had] a lot of stuff to do and it was very stressful."  (<u>Id.</u>, Ex. J at 12:1-9.)

### 1.    Conflict Between Plaintiff and Defendant Drayton in 2017

On October 22, 2017, Plaintiff and Drayton engaged in a verbal argument over data entry in the police dispatch system.  (<u>See</u> Doc. Nos. 28, Ex. 2 at 133:3-7; 33, Ex. A at 28:9-31:2.)  As

---

[1]    The official position is called a Public Safety Communications Specialist (<u>see</u> Doc. No. 28, Ex. 1), but the parties mainly refer to the position as a Transit Police Dispatcher.  (<u>See</u> Doc. Nos. 1 ¶ 25; 27 at 14.)  In other instances, the position is informally referred to as a "radio room dispatcher," or workers in "police radio."  (<u>See</u> Doc. Nos. 30, Ex. 9; 31, Ex. 27 at 10-11.)

[2]    (<u>See</u> Doc. Nos. 27 at 11; 28, Ex. 2 at 88:3-8.)

[3]    The Transit Police Dispatcher shifts are broken into A, B, and C "Tours," which refer to different shifts throughout the day.  (<u>See</u> Doc. No. 33, Ex. H at 29:6-8.)

the exchange lessened, Drayton accused Plaintiff of calling him "derogatory names" including the N-word. (Doc. No. 33, Ex. A at 30:9-13.) In response, Drayton emailed his supervisor, Michael Boring, and complained of the incident. (See Doc. No. 29, Ex. 5 at 1.) The next day, Boring was assigned to an Internal Affairs Investigation of the incident and began his investigation the following day. (See id.)

After interviewing Plaintiff, Drayton, and a third coworker who witnessed the incident, Boring sent an Internal Affairs Memorandum to SEPTA's Chief Thomas Nestel, in which he concluded that the "incident [did] not rise to the level of workplace violence[,]" though "both Dispatchers Drayton and Washington may have violated policy by . . . quarreling with each other and using profanity in the workplace." (Id. at 2.) Boring found that "the use of the slur . . . 'n*gger'" was unsubstantiated as it "was denied by Dispatcher Washington and could not be [corroborated] by [the third coworker] who was in close proximity . . . ." (Id.) Boring also "d[id] not see fault being one sided" as "Drayton openly admitted to using profanity including 'get the F out of here' in his interview." (Id.)

On October 26, 2017, four days after the incident with Drayton, Plaintiff emailed Boring requesting that he "seriously consider separating" Plaintiff and Drayton's shifts "for the purposes of maintaining good will and order among the dispatchers." (Doc. No. 33, Ex. C.) Plaintiff explained that he "d[id] not feel secure in the areas of trust and comfort when working with [Drayton]" because he believed he was being "intentionally set up for failure, embarrassment, ridicule, and talked about to Transit Police and other dispatchers in a disparaging way by [Drayton] via text [messages] and in the office . . . on multiple occasions." (Id.)[4] Plaintiff thought "a [shift]

_____

[4] During Plaintiff's deposition, he testified that he requested a shift change because he felt "as if [he] was being set up for failure by Denise Singleton and Richard Drayton, that they were manipulating the system for [him] to fail." (Doc. No. 28, Ex. 2 at 136:17-24.) Plaintiff

change w[ould] be the best fix, which [he] believe[d] Drayton w[ould] also agree [to] if asked."

(Id.)  Regardless, Plaintiff concluded the email by telling Boring that his "assistance in an expedited manner to resolve th[e] matter ha[d] and continue[d] to be greatly appreciated[,]" and he would "respect the decision [Boring] ma[de] in the matter . . . ." (Id.)[5]

## 2. Defendant Singleton Becomes Involved in the C Tour Conflict

On November 19, 2017, Plaintiff again emailed supervisor Boring alleging that Drayton and Singleton were "very rude" toward him during the previous shift.  (Doc. No. 33, Ex. E.)  Plaintiff claimed Drayton and Singleton "alienate[d] [him] and talked around [him] for eight hour[s], they talked to one another and totally ignored [him] even about some of the work related cases."  (Id.)  He expressed that he felt "bullied due to [his] inexperience and lack of seasoned knowledge in certain areas of [the] job[,]" and that their conduct "create[d] a work environment that a reasonable person would consider intimidating, hostile and abusive, that no one should have to work in."  (Id.)  Therefore, Plaintiff "respectfully ask[ed] that [he] work with different employees and that something be done about this immediately."  (Id.)  Later that day, Boring replied to the email thanking Plaintiff "for continuing to speak up on this" and ensuring Plaintiff that he would "continue looking into this as soon as" he returned to work that week.  (Id.)[6]

---

believed Singleton and Drayton were "holding back information that was critical and because of [his] new status, to make [him] look incompetent."  (Id. at 136:24-137:3.)

[5]  In a Follow-up Investigation Memorandum sent to Chief Nestel on July 2, 2018, Boring addressed this email and stated that the shift change request "was discussed in private and was denied.  (Doc. No. 29, Ex. 8 at 4.)  Boring explained that "[t]he transfer of the most junior dispatcher to a coveted tour of duty would be inappropriate and unfair" given that Plaintiff's "comments regarding being 'set up for failure' were untrue and all dispatchers were advised to help [Plaintiff] which, from [his] observations, they ha[d] been."  (Id.)

[6]  In the July 2, 2018 Follow-up Investigation Memorandum, Boring addressed this email.  (See Doc. No. 29, Ex. 8 at 4.)  He stated he reminded Plaintiff that "personality conflicts between [him] and [his] coworkers need[ed] to be resolved" amongst themselves.  (Id.)

Two days later, Plaintiff emailed Boring about "another thing that also bother[ed] [him] that . . . [he] fe[lt] . . . also need[ed] to be addressed." (Doc. No. 29, Ex. 6.) Plaintiff explained that on November 17 "while on shift," a male committed suicide at a SEPTA station and the dispatchers "were trying to figure out his race because that and the time of death pronouncement by medical professionals were being requested." (Id.) Plaintiff alleged that Drayton and Singleton proceeded to converse about the man's race, and the two laughed at Singleton's use of the word "mulatto." (Id.) Plaintiff "found that very offensive[,] [e]specially since [he is] of mixed races and they [were] aware of it[.]" (Id.) After explaining the historical, derogatory nature of the word "mulatto," Plaintiff concluded by telling Boring that "[t]he incident k[ept] coming to mind so [he] felt compelled to bring it to [Boring's] attention." (Id.)

On November 29, Plaintiff, Drayton, Singleton, and a fourth coworker, Jonina Respes, attended a counseling session administered by SEPTA Training Department employee Donna Lucas. (See Doc. No. 33, Exs. F; H at 101:7-12.) After the session, Plaintiff emailed Boring about the "level of despicable behavior that [Drayton] was engaged in that came out in the meeting" which he felt was "worthy of an immediate investigation by the EEOC." (Doc. No. 33, Ex. F.) Plaintiff stated that Drayton "admitted to it and apologized to everyone in the room for his behavior[,]" but Plaintiff thought his behavior was "way beyond the level of a mere apolog[y]." (Id.) Plaintiff further accused Drayton of having "a serious flaw in his moral and ethical values system[,]" and concluded the email by "request[ing] a shift chang[e]" for either Drayton or himself. (Id.)[7] Roughly one hour later, Boring replied to the Plaintiff's email as follows:

---

[7] In the July 2, 2018 Follow-up Investigation Memorandum, Boring addressed this additional email. (See Doc. No. 29, Ex. 8 at 4.) He noted that "[t]his was an opinion email from [Plaintiff] where he expressed his personal opinions of a coworker and we discussed this again verbally. The conclusion was that personality conflicts are not workplace harassment or violence violations." (Id.)

I'm under the impression that the training session was for the free flow of information and opinion between all of you. I was not to be included (supervisor) so that none of you would be afraid to speak your mind… Any of you! Even about me! I believe I said this earlier this week. If there was any time that things went too far, Donna would be there to address it.

If there was indeed wrong doing on anyone's part Donna will be in touch with me.

(Id.)[8]

### 3. Conflict Between Plaintiff, Drayton, and Singleton Continues in 2018

On February 3, 2018, Plaintiff emailed Boring to explain an inconsistency in data entry. (See Doc. No. 29, Ex. 7.) Plaintiff stated that he asked Singleton how to complete a data entry task that he had not done before, to which Singleton told Plaintiff to send her the information and "she would put together the . . . synopsis for" him. (Id.) When Plaintiff asked Singleton for updates later in the shift, she told Plaintiff the matter had been taken care of; however, upon checking the computer system, Plaintiff claims that he found the matter had not been resolved. (See id.) According to Plaintiff, "[t]he only conclusion [he] could come up with is [Singleton] used [him] to . . . set [him] up for failure by not doing what she assured [him] she would take care of." (Id.) Therefore, Plaintiff felt the need to email Boring because he "did not want to be written up again for a [data entry] issue . . . because the Senior Dispatcher is intentionally or negligently setting [him] up for failure." (Id.)[9]

On June 28, 2018, Plaintiff sent another email to Boring to "demand an investigation and to file a complaint" about an altercation between him and Drayton during their shift on June 23.

---

[8] Boring further elaborated in the July 2, 2018 Follow-up Investigation Memorandum that he did in fact "follow[]up with Donna Lucas and there were no policy violations during their training session." (Doc. No. 29, Ex. 8 at 4.)

[9] In the July 2, 2018 Follow-up Investigation Memorandum, Boring also addressed this email. (See Doc. No. 29, Ex. 8 at 4.) He stated that the matter was resolved since he "spoke to [Plaintiff] upon his return from work" and addressed the data entry failure "with all the dispatchers and no punitive action was necessary." (Id.)

(Doc. No. 30, Ex. 10 at 1.)[10] In the email, Plaintiff claimed that Drayton and Singleton "ha[d] been emotionally abusing [him] since 10/2017 and although [he] ha[d] mentioned it to [Boring] multiple times nothing ha[d] been done." (Id.) Moreover, Plaintiff wrote that he felt uncomfortable working with "these out of control coworkers[,]" their behavior "caus[ed] a hostile work environment[,]" and he was "not the only one who . . . [was] offended" by their behavior. (Id.) Near the end of the email, Plaintiff bemoaned that he was tired of the "derogatory remarks and slurs based on [his] complexion[.]" (Id. at 2.)

On June 30, 2018, Defendant-supervisor Captain Daryl Jones ("Captain Jones") sent a Memorandum to Chief Nestel entitled "Work Conditions in Police Radio Interview." (Id., Ex. 9.) In the Memorandum, Captain Jones summarized Plaintiff's description of issues he felt amounted to a hostile work environment:

> 1 – other dispatchers talking about the color of suspects, victim's skin
> 2 – unprofessional talk of victims and complainants['] cases
> 3 – name calling of him when he is not around . . . .

(Id.)

After a 40-minute phone conversation with Plaintiff followed by an in-person meeting, Captain Jones wrote that he first "advised [Plaintiff] of his right to file an [Equal Employment Opportunity ("EEO")] complaint internally or externally[,] to which he declined." (Id.) Captain Jones then "informed [Plaintiff] that after hearing his complaints it would be [his] quest to change the environment of Police Radio for the better and assured him that . . . the change in Lieutenants . . . [to Defendant-supervisor] Gritsko would bring in a more organized, professional workplace."[11]

---

[10]  In the email, Plaintiff also "request[ed] an investigation" of the previous incidents he had complained of to Boring. (See Doc. No. 30, Ex. 10 at 1.) As stated in notes 5-9, supra, Boring addressed all emails in the July 2, 2018 Follow-up Investigation Memorandum.

[11]  Gritsko replaced Boring as supervisor in July 2018. (See Doc. No. 33, Ex. J at 9:9-10.)

(Id.)  "In addition, [he] assured [Plaintiff] that [he] would personally oversee the environment and speak to all radio room personnel about the expectations of conduct in the workplace."  (Id.)  Captain Jones noted that "[a]fter hearing [his] proposed resolutions," Plaintiff "was satisfied and confident that he would see a better workplace[,] and no investigation into previously mentioned perceived wrong would be necessary."  (Id.)

On July 2, 2018, supervisor Boring sent Chief Nestel a Follow-up Investigation Memorandum regarding the altercation between Plaintiff and Drayton on June 23, in which he found that Plaintiff and Drayton "may have violated policy by quarreling with each other and using profanity toward each other in the workplace."  (Doc. No. 29, Ex. 8 at 3.)  In the Memorandum, Boring also mentioned that Plaintiff "went on with a complaint regarding the 'abuse that [he] ha[d] been receiving since [he] started work for [SEPTA].'  When asked what kind of complaint [did he] wish to file he stated 'the bullying, the harassment, [he didn't] know.  [He] need[ed] to look it up on what exactly.'"  (Id. at 2.)

On October 9, 2018, Drayton and Singleton both participated in an informational session on "Septa Policies & Workplace Behavior."  (See Doc. No. 30, Ex. 17 at 1-2.)  On October 10, Plaintiff also participated in the same informational session.  (See id. at 4; id., Ex. 15.)[12]

On October 16, Drayton emailed the new C Tour supervisor, Defendant Gritsko, and Captain Jones about three separate instances where he alleged Plaintiff "displayed an unprofessional attitude and delivered the perception of being uncooperative and of a harassing nature."  (Id., Ex. 11 at 1.)  Two instances Drayton complained of occurred during their shift on October 14, where he claimed that Plaintiff responded to him sarcastically, aggressively, and in an

---

[12]  Jakira Jones participated in an informational session on SEPTA policies and workplace behavior on November 21, 2018, after her first altercation with Plaintiff which is discussed in Section II.A.4, infra.  (See Doc. No. 30, Ex. 17 at 3.)

"elevated tone." (Id.) The third instance occurred during their shift on October 15, where Drayton claimed Plaintiff was referring to him when said he had to work "with pieces of shit like up in the front" and he "hate[d] working with that guy[.]" (Id. at 1-2.) Drayton ended the email "asking that [his] report be tak[en] into consideration in regards to continuous workplace harassment/hostile work environment." (Id. at 2.)[13]

On October 20, Plaintiff emailed Captain Jones to accuse Drayton and Singleton of violating policy directives by using their cellphones during their shift. (See Doc. No. 30, Ex. 16 at 1.) In response, Drayton and Singleton were directed to "receive a Counseling and Re-instruction" on the unauthorized use of personal electronic devices. (Id. at 3.)[14]

On October 25, SEPTA Captain John Arnold sent Chief Nestel an Internal Affairs Memorandum regarding Drayton's October 16 complaints, wherein he noted that Plaintiff "admitted that he does hate working with Drayton" and that his "working with sh*tbags" comment "was not directed towards Drayton," but if it was, "[Plaintiff] would have said 'yeah I got to continue to work with sh*tbags.'" (Id., Ex. 13 at 2.) On October 31, Arnold sent Plaintiff a Memorandum, informing him that his actions conflicted with three SEPTA policies and "specific departmental violations and charges [were] being considered . . . ." (Id., Ex. 12 at 1, 4.) Arnold afforded Plaintiff until November 2 to send in information he would "like to have considered prior to the decision being made regarding discipline[.]" (Id. at 1.)

---

[13] Notably, also on October 16, 2018, Gritsko and Captain Jones completed Plaintiff's performance evaluation in which they found Plaintiff had overall met expectations. (See Doc. No. 20, Ex. 24 at 1-2.) They wrote that Plaintiff was "reliable and possess[ed] a strong work ethic. However, [he] need[ed] to work in multi[-]tasking and practice Active Listening during periods of heavy workload and high pressure situations." (Id. at 3.)

[14] Drayton and Singleton both attended counseling on October 31, 2018. (See Doc. No. 30, Ex. 16 at 4-5.)

On November 1, Plaintiff sent Arnold and Gritsko an email refuting Arnold's Memorandum. (See id., Ex. 14.) Plaintiff "f[ound] it questionable that [he] was found in violation" for saying he hated working with Drayton and that he worked with "sh*tbags." (Id.) In fact, Plaintiff maintained that the "sh*tbags" comment was "grossly taken out of context" and was actually "an endearing statement that [he] made referencing the entire C Tour shift . . . personnel that [he] enjoy[ed] working with every day . . . ." (Id.)[15]

### 4. Defendant Jakira Jones Becomes Involved in the C Tour Conflict

On November 19, 2018, coworker Jakira Jones emailed Gritsko to express discontent with Plaintiff's work ethic and to disclose a "verbal confrontation" they had at work that night. (Id., Ex. 19 at 1.) Jakira Jones stated that every night when she arrived at work, she noticed Plaintiff was "not answering phones or radios[,]" and on November 19, "several jobs need[ed] to be entered" into the computer system but Plaintiff and a coworker were "laughing and not paying attention to radio." (Id.) As the "senior dispatcher on the floor," Jakira confronted Plaintiff about his work but her effort was fruitless since Plaintiff "always g[ot] smart when someone sa[id] something to him . . . ." (Id. at 3.)

The next day, Plaintiff emailed Gritsko and Captain Jones about the same altercation with Jakira Jones giving his point of view. (See id.) Plaintiff claimed Jakira "yelled in a smug way" toward him, "blasting and attempting to embarrass" him. (Id.) And generally, Jakira allegedly "use[d] foul language and insults with attitude everyone she sp[oke] to on the phone while operating as a dispatcher . . . ." (Id.) In the last paragraph of the email, Plaintiff shared his overall

---

[15] The record does not indicate whether Plaintiff was in fact disciplined; however, it is presumed that Plaintiff was disciplined because, as discussed in Section II.A.5, infra, Plaintiff was issued a one-day suspension after "the third incident" he was found to have "engag[ed] in inappropriate workplace behavior[.]" (Doc. No. 30, Ex. 22) (emphasis added). Although there were a number of incidents in which complaints were made about Plaintiff, this was the first Internal Investigation Memorandum where discipline was discussed.

discontent with his C Tour coworkers, stating that he felt he had to "watch [his] back and every word [he] sa[id] and everything [he] d[id] . . . ." (Id. at 5.)  He described C Tour as a "hostile environment" due to the "eye rolling, teeth sucking, loud sighs, and being ignored when [he] talk[ed] to Singleton, Drayton, and also [Jakira] Jones."  (Id.)  Plaintiff believed he was "being targeted because of [his] racial status or veteran status or both."  (Id.)

Captain Jones forwarded Plaintiff's email to higher authority two hours after receiving it. (See id., Ex. 20 at 2.)  He deemed Plaintiff's email a "repeated accusation of a hostile work environment" and recommended that "an Internal Affairs investigation . . . be initiated."  (Id.) Captain Jones was informed that the matter would be handled by SEPTA's Office of Professional Responsibility ("OPR") for internal investigation consistency.  (See id. at 1.)  On November 21, SEPTA Sergeant Devon Isaac was tasked with conducting an internal investigation of the altercation, which consisted of interviewing Jakira Jones, Singleton, Drayton, Plaintiff, Gritsko, and two other employees, as well as reviewing the November 19 radio room transmissions during the C Tour shift.[16]  (See id., Ex. 19 at 1, 5-11.)

On November 26, Plaintiff emailed Gritsko to complain about Jakira Jones snatching a clip board off his desk during their shift on the 25th.  (See id., Ex. 18 at 1.)  Plaintiff also claimed Jakira was "challenging [his] manhood with her comments and [was] trying to provoke a response from [him.]"  (Id. at 1-2.)  Two days later, Sergeant Isaac also was tasked with conducting the Internal Investigation of this incident, which consisted of interviewing Plaintiff and Jakira Jones.  (See id. at 1.)

---

[16]  Consistent with Jakira Jones' allegations in her November 19 email about Plaintiff not answering the phones or radio (see Doc. No. 30, Ex. 19 at 1, 3), Isaac's review of the eight radio room transmissions showed that four of the eight radio calls went unanswered, while two were answered by a female voice.  (See id. at 11.)

On December 13, 2018, Isaac sent Internal Investigation Memoranda to Chief Nestel summarizing the two investigations. (See id., Exs. 18-19.) Regarding the November 19 altercation, Isaac concluded that the "incident in the radio room between [Jakira] Jones and [Plaintiff]" may have violated SEPTA workplace policy. (Id., Ex. 19 at 11.) While it was evident that Plaintiff and Jakira "do not like each other and do not like it when they even briefly work together," Isaac noted that "they should [have been] able to put the job at hand to the forefront, be[en] professional and work[ed] together for the good of the department and the officers." (Id.) Regarding the November 25 incident, Isaac similarly concluded that it may have violated SEPTA workplace policy. (See id., Ex. 18 at 3.) Isaac also expressed discontent with Plaintiff and Jakira's "inability to work together and their lack of discipline to not just say things that are better left unsaid . . . ." (Id.)

### 5. Resulting Discipline

In response to the November 19 altercation, Plaintiff and Jakira Jones both received individual, identical Memoranda from Gritsko issuing them a written reprimand for violating SEPTA Police Department "Directive 508: Quarreling with members of the Department." (Id., Ex. 21 at 1-2.) In the Memoranda, Gritsko noted that Plaintiff and Jakira Jones "were accusing each other of various infractions of radio room procedure." (Id.) Gritsko made clear that their "nit picking and bickering . . . . w[ould] not be tolerated in police radio and the control center." (Id.)

In response to the November 25 altercation, SEPTA's Police Board of Inquiry ("PBI")[17] reviewed Isaac's Internal Investigation for "possible violation[s] of the SEPTA Police Department Directives . . . . due to [it] being the second interaction involving the same Dispatchers within the

---

[17] The Police Board of Inquiry "serves as an independent assessment board that reviews and determines whether a [union] members' conduct amounts to a violation. If a violation is found, the PBI is also tasked with determining the appropriate level of discipline to be levied." (Doc. No. 30, Ex. 23 at 2.)

same month." (Id., Ex. 22.)  In a Memorandum PBI sent to Chief Nestel on December 31, 2018,

PBI explained it reviewed "all documents, statements and interviews" and summarized the

altercation as follows:

> On Sunday, November 25, 2018 . . . Dispatcher [Jakira] Jones needed the DC
> number clipboard which was on Dispatcher Washington's console.  Dispatcher
> Washington was not using it at the time Dispatcher Jones took it off his console to
> enter numbers from a Theft of Services job she was handling at her console.
> Consequently Dispatcher Washington gets up and says he wasn't done with it and
> took the clipboard off Dispatcher Jones desk.  At that time Dispatcher Jones
> summoned Officer Crosby because she wanted him to mediate instead [of] things
> getting out of hand.

(Id.)  PBI believed Jakira Jones' summoning of a mediating party showed "she doesn't want to be

involved with the back and forth arguments again." (Id.)  Because "[t]his was the third incident[18]

involving [Plaintiff] engaging in inappropriate workplace behavior" and it "w[ould] not be taken

lightly[,]" PBI found Plaintiff "in violation of [SEPTA] Disciplinary Code 508, specifically

Quarreling with Members of The Department." (Id.)  "In accordance [with] the Progressive

Scale[,]"[19] PBI therefore "recommend[ed] the issuance of a one day suspension without pay." (Id.)

(emphasis omitted).

---

[18]  As stated in note 15, supra, the first incident is presumably the October 15 altercation with
Drayton in which Plaintiff admitted to saying he hated working with Drayton and that he
worked with "sh*tbags." (See Doc. No. 30, Ex. 13 at 2.)  The second incident is the November
19 altercation with Jakira Jones. (See id., Exs. 19 at 11; 21 at 1-2.)

[19]  Gritsko described the Progressive Discipline Scale as follows:

> [P]rogressive discipline . . . is discipline to scale to address . . . minor issues.  What
> that means is a person is giving [sic] counseling, which isn't technically discipline
> but then if the situation warranted, an investigation was done usually by internal
> affairs and then a committee of two or three commanding officers would review
> that and they recommend discipline or not discipline, but that was tracked on a
> progressive scale which means for 12 months you were on progressive discipline.
> If you have another violation of a progressive disciplinary issue regardless if it was
> related to the first issue, you went to the second step which would be written

### 6. Plaintiff Files Formal Complaint Followed by New Allegations of Wrongdoing by Drayton

On March 18, 2019, Plaintiff filed a formal complaint with SEPTA's EEO Department, wherein he named Drayton, Singleton, and Jakira Jones as the "alleged offenders" and identified the "issues" as harassment, improper comments, racial/ethnic slurs, and "bullying in the workplace." (See Doc. No. 30, Ex. 25 at 1.) In the complaint, Plaintiff alleged that he was "constantly working in a hostile environment where [he was] routinely disrespected and subject to discriminatory comments and harassment." (Doc. No. 31, Ex. 25 at 2.) He further alleged he was "concerned with collective efforts by [his] harassers in sabotaging [his] work to make [him] appear incompetent" and that his "health ha[d] fallen and [he was] now suffering from depression because of the abuse." (Id.)

In a separate section of the complaint, Plaintiff wrote that he felt this alleged harassment occurred "[b]ecause of a so called 'light skin vs. dark skin' mindset [his] harassers believe in." (Id.) Plaintiff averred that "[t]his colorism is racism" and he believed it was "the root of the problem . . . ." (Id.)[20]

Two days after filing the EEO complaint, Plaintiff emailed Gritsko "to inform him of two separate incidents" that predated the formal complaint "in which he believed he was being harassed and discriminated against by . . . Drayton." (Id., Ex. 27 at 2.) In addition, Plaintiff alleged that his

---

reprimand, one-day suspension, three-day suspension and so on. [There are] five steps of [the] progressive disciplinary process . . . .

(Doc. No. 33, Ex. J at 25:13-26:12.)

[20] Plaintiff further alleged that "[t]he shade bias forced a previous light complected [sic] worker to resign and [he] believe[d he was] being targeted in efforts to force [him] to resign as well." (Doc. No. 31, Ex. 25 at 2.) The coworker Plaintiff refers to is Jonina Respes. (See Doc. Nos. 1 ¶ 43; 32 at 16, 19.) As explained in note 44, infra, however, the evidence regarding Respes does not defeat summary judgment.

prior complaints of harassment by Drayton were never addressed.  (See id.)  The Internal

Investigation Memorandum for this complaint summarized the contents of the email as follows:

> The first incident occurred on March 4th, 2019 around 9:55pm.  PSCS[21] Washington
> allege[d] that PSCS Drayton told a joke that PSCS Washington believed was
> discriminatory and offensive.  The second incident occurred on March 16th, 2019
> around 4:55pm.  In this complaint PSCS Washington allege[d] that PSCS Drayton
> attempted to make him look incompetent by talking to him in a loud, smug manner
> during an ongoing job.  PSCS Washington also alleges in this e-mail that he has
> told Captain Arnold and Captain Jones about what he feels is discrimination and
> harassment by PSCS Drayton and that they haven't done anything about it.

(Id.)  Thereafter, Plaintiff sent another email to Gritsko alleging a third incident of wrongdoing by

Drayton.  (See id.)  This incident also was included in the above Memorandum and was

summarized as follows: "In a second e-mail, dated April 1st, 2019, PSCS [Washington] allege[d]

that on March 31st, 2019 around 3:08pm PSCS Drayton use the 'N word' several times while

talking to other officers about an arrest handled by Officer Edens."  (Id.)

On April 1, 2019, SEPTA Sergeant Marc Pasquarella was assigned to investigate the three

above incidents.  (See id.)  His investigation consisted of: (1) interviewing Plaintiff, Drayton,

Singleton, five officers, two sergeants, and SEPTA's Assistant Director, Norton Wilder; (2)

reviewing the work schedule for the month of March; (3) reviewing Plaintiff's original and

supplemental emails; and (4) reviewing another sergeant's notes regarding her March 16 meeting

with Plaintiff.  (See id. at 9.)  On April 17, Pasquarella sent his 10-page Internal Investigation

Memorandum to Chief Nestel detailing all interviews, reviews, and his ultimate conclusions.[22]

(See id. at 2-11.)  The "Conclusion" section of Pasquarella's Memorandum reads as follows:

---

[21]  "PSCS" is short for Public Safety Communications Specialist.  See supra note 1.

[22]  Sergeant Pasquarella notes in his Internal Investigation Memorandum that his investigation
took place while the investigation into Plaintiff's EEO complaint was separately ongoing.  (See
Doc. No. 31, Ex. 27 at 2.)  Indeed, on April 2, 2019, days before Pasquarella interviewed
Plaintiff, EEO/Employment Relations Manager Ekaette Oduok conducted a confidential

In regards to PSCS Washington's complaint that on March 4th, 2019 PSCS Drayton told a discriminatory and offensive joke, I find that to be UNSUBSTANTIATED. I interviewed all the involved parties and none of them recall PSCS Drayton telling a joke or showing anyone any pictures of his phone. One witness, Norton Wilder, confirmed PSCS Drayton's account of the incident. PSCS Washington also admits in his interview that he only partially heard what PSCS Drayton was saying and that he just assumed it was a joke based on the limited information he had. . . .

In regards to PSCS Washington's complaint that on March 16th, 2019 PSCS Drayton spoke to him in an unprofessional manner and attempted to make him appear incompetent, I find that to be UNSUBSTANTIATED. PSCS Drayton and PSCS Washington engaged in a back and forth conversation over an ongoing job. The independent witness, PSCS Singleton[,] refuted PSCS Washington's claim that he was on the phone by saying that he was talking to another officer . . . and the claim that PSCS Drayton yelled at him. PSCS Singleton states that both dispatchers raised their voices because of the distance between them and the difficulty in hearing each other over the background noise. It should also be noted that PSCS Washington made a claim that PSCS Drayton kept doing things to compound the situation, but could not provide specific details.

In regards to PSCS Washington's complaint that on March 31st, 2019 PSCS Drayton said "Hey N*gger!" several times while talking to other officers, I find that to be UNSUBSTANTIATED. Everyone that I interviewed that was present when this allegedly occurred denied hearing that word. Officer Crosby stated that he remembers them saying, "Haymaker Dae" in reference to a video involving Officer Edens and an arrest she was involved in at the HUB of Hope. Sergeant Coates stated in his interview that he was helping PSCS Washington log on to his computer when this incident was alleged to have happened. When I brought this to the attention of PSCS Washington, he stated that the time was only an approximate and that Sergeant Coates had stepped away for a couple of minutes and that's when it occurred.

In regards to PSCS Washington's complaint that Captain Arnold and Captain Jones have not done anything about his complaints, I find that to be UNSUBSTANTIATED. During his interview PSCS Washington made several claims that Captain Jones and Captain Arnold were not taking his complaints seriously and that they haven't done anything about them including not initiating investigations or notifying EEO. There are several Internal Affairs Investigations and EEO Investigations in to [sic] the behavior and conduct of the radio room dispatchers. There is also documentation provided from Captain Jones that shows

---

interview of Plaintiff for the EEO investigation. (See Doc. No. 29, Exs. 3-4.) On April 17, 2019, the same day Pasquarella sent Chief Nestel the Memorandum, Manager Oduok conducted confidential interviews of three Transit Police Officers for Plaintiff's EEO investigation. (See Doc. No. 31, Exs. 28-30.) These three Officers also were interviewed for Pasquarella's investigation. (See id., Ex. 27 at 9.)

that he spoke with PSCS Washington after a complaint in June 2018 and that PSCS Washington was satisfied with the outcome of the meeting.[23]    I gave PSCS Washington several chances to provide documentation that would support his claim, but all he was able to provide is an e-mail in which Captain Jones was blind copied on and was sent BEFORE the meeting between the two.  PSCS Washington also sent [a] second e-mail quoting sections from the [Policy] Directives as to why Captain Jones and Captain Arnold should be held responsible for not responding to his complaints, but fails yet again to provide any evidence to support these claims.

In conclusion, all of PSCS Washington's complaints are UNSUBSTANTIATED. Every claim that he makes is refuted by at least one independent witness, including a supervisor.  I believe that EEO should be informed of these complaints to make sure that they are included in their on-going investigation in to [sic] PSCS Washington's complaints.

(Id. at 10-11.)

### 7.    Plaintiff Serves His One-Day Suspension, Resigns, and Files Complaint with the EEOC and PHRC

On April 29, 2019, a "second level"[24] grievance hearing, filed by Plaintiff's Union on his behalf, was held regarding the November 25 altercation between Plaintiff and Jakira Jones that resulted in Plaintiff's one-day suspension pursuant to the "progressive discipline scale." (Doc. No. 30, Ex. 23 at 1.)  At the hearing, Plaintiff's Union primarily argued that there was a "disparity between the discipline issued to [Plaintiff] and that issued to [Jakira] Jones." (Id.)  The Union also argued that the investigations into the two altercations between Plaintiff and Jakira Jones "were initiated too close in time and did not allow the animosity between [Plaintiff] and Jones to dissipate prior to issuing discipline."  (Id.)

SEPTA Office of Professional Responsibility Inspector Jahlee Hatchett presided over the hearing and ultimately found that "the Union ha[d] not presented any evidence which suggest[ed]

---

[23]    (See Doc. No. 30, Ex. 9) ("[Captain Jones] advised [Plaintiff] of his right to file an EEO complaint internally or externally to which he declined.").

[24]    Captain Arnold presided over the first level grievance hearing and denied the grievance.  (See Doc. No. 30, Ex. 23 at 2.)

that the discipline issued to [Plaintiff] should [have been] overturned." (Id.) She explained as

follows:

> In this matter, a review of the internal affairs investigations indicate that both [Plaintiff] and [Jakira] Jones were found to have violated department policy and issued written reprimands in connection with [the November 19 altercation]. At the same time, a concurrent investigation was being conducted with regards to a subsequent incident [on November 25]. In connection with that matter, the PBI found that [Plaintiff] was the only one who violated policy and issued him a one day suspension based on the progressive scale. Therefore, the Union's contention that there was a disparity is without merit since [Plaintiff] was the only one found to have violated policy. [Plaintiff's] Union has not presented a scintilla of evidence to show that the PBI's decision was motivated by bias, prejudice, or some other nefarious intent. Keeping in mind that [Plaintiff] was found to have taken a clip board from a fellow dispatcher while she was using it, just days after they had a confrontation. In fact, the decision to issue the suspension is supported by the PBI's finding that [Plaintiff] engaged in misconduct/policy violations on two prior occasions within the reckoning period. . . . Based on that, the discipline appears to be the culmination of [his] own conduct and behavior that he has yet to improve upon. Nothing presented in the investigations or the grievance hearings give the appearance of inequity or disparity.

(Id.)

On June 13, 2019, SEPTA Labor Relations Manager Susan Sanderson wrote to Plaintiff's

Union regarding a "Labor Relations Step"[25] hearing held on May 31, 2019, explaining that

"nothing ha[d] been presented that warrant[ed] disturbing the discipline assessed" and "[i]n

accordance with progressive discipline, a one-day suspension was warranted." (Doc. No. 31, Ex.

31.) Sanderson did note, however, that "the Union [was] correct that [Plaintiff] should not have

served a suspension until the grievance procedure was exhausted."[26] (Id.) Moreover, Sanderson

mentioned that Plaintiff's EEO complaint "ha[d] been investigated and a decision [was]

---

[25] The record does not indicate what a "Labor Relations Step" hearing is, but it is presumably part of the grievance process since Sanderson states that Plaintiff mistakenly served his suspension before his grievance procedure was exhausted. (See Doc. No. 31, Ex. 31.)

[26] The record also does not indicate when Plaintiff served his suspension.

forthcoming." (Id.)

Two days later, notwithstanding that the EEO had not yet rendered a decision, Plaintiff resigned. (See id., Ex. 32.) Thereafter, on July 31, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") against Defendants SEPTA, supervisors Boring, Gritsko, and Captain Jones, and coworkers Drayton, Singleton, and Jakira Jones.[27] (See id., Ex. 26.)

### B. The Instant Case

On August 10, 2019 the EEOC issued Plaintiff a Notice of the Right to Sue, and on September 11, 2019 Plaintiff filed the instant suit against Defendants alleging violations of: (1) Title VII of the Civil Rights Act of 1964, codified in 42 U.S.C. §§ 2000e–e-17; (2) 42 U.S.C § 1981; (3) the Pennsylvania Human Relations Act ("PHRA"), codified in 43 P.S. §§ 951 et seq.; and (4) the Philadelphia Fair Practices Ordinance ("PFPO"), codified in 43 P.S. §§ 9-1100 et seq. (See Doc. No. 1 ¶¶ 1, 17-18.) In the Complaint, Plaintiff asserts twelve causes of action. (See id. at 15-30.) The following claims are brought only against Defendant SEPTA: (1) race discrimination under Title VII and the PHRA; (2) hostile work environment under Title VII; (3) retaliation under Title VII; and (4) aiding and abetting under the PHRA. (See id. at 15-16, 19, 26-27.) The following claims are alleged against all Defendants: (1) race discrimination under Section 1981 and the PFPO; (2) hostile work environment under Section 1981; (3) retaliation under Section 1981, the PHRA, and the PFPO; and (4) aiding and abetting under the PFPO. (See id. at 19, 22-23, 26-27, 29-30.)[28]

---

[27] Of note, Plaintiff drafted the Charge of Discrimination on March 25, 2019, but did not file it until July 31. (See Doc. No. 31, Ex. 26 at 1-3.)

[28] In the Complaint, Plaintiff states that he "will seek leave to amend" all PHRA and PFPO claims on the ground that they "are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's [c]harge[s]." (Doc. No. 1 ¶¶ 178-

In the Complaint, Plaintiff asserts that he was discriminated and retaliated against "by his employer solely due to his [r]ace, and in retaliation for his opposition and reporting the unlawful behavior to management." (Id. ¶ 1.) He avers that "[a]lmost immediately" after he began working for SEPTA, he was subjected to "a hostile work environment and racial discrimination" by coworkers Drayton, Singleton, and Jakira Jones. (Id. ¶ 26.) For example, Plaintiff claims the three coworkers "exclud[ed] him from work discussions . . . ma[de] sarcastic comments directed at [him,]" "derogatorily discuss[ed] [his] complexion" by making statements about his "light skin privilege[,]" and made "discriminatory and racist comments" about him. (Id. ¶¶ 27, 38, 57-58.) He further alleges that Drayton "verbally accosted" him, "made a false complaint in an attempt to discredit [Plaintiff], harm [his] reputation, and to gain favor for himself . . . in the eyes of their supervisors[,]" and told a joke to coworkers that "contain[ed] the punchline 'I'm light skin[.]'" (Id. ¶¶ 28, 33, 83.) Drayton and Singleton allegedly "joked" about a deceased person "being '[Mulatto],' a derogatory term for mixed race individuals." (Id. ¶ 86.) Singleton and Jakira Jones allegedly "loudly discuss[ed] having never dated and opposition to dating someone who is light

---

79, 181-82, 184-85, 188-89, 192-93, 196-97.) "[T]he PHRC has exclusive jurisdiction over all cases involving a claim of discrimination for one year so that it may investigate and potentially resolve the claim." Eldridge v. Municipality of Norristown, 828 F. Supp. 2d 746, 758 (E.D. Pa. 2011), aff'd, 514 F. App'x 187 (3d Cir. 2013) (citing Burgh v. Borough Council of Montrose, 251 F.3d 465, 471 (3d Cir. 2001)). Normally, "a plaintiff must exhaust all administrative remedies and comply with all procedural requirements" before seeking judicial remedies, but "courts in the Third Circuit have adopted a more flexible approach to . . . exhaustion by permitting plaintiffs to maintain [their] claims if the period of exhaustion expires during the pendency of litigation or if plaintiff files an amended complaint after the period of exhaustion." Id.

Here, even though Plaintiff filed suit less than a year after filing charges with the PHRC, and he never filed an amended complaint, "th[is] defect has been cured by the passage of time." Wardlaw v. City of Philadelphia, No. 09-3981, 2011 WL 1044936, at *3 (E.D. Pa. Mar. 21, 2011). Because more than one year has elapsed since Plaintiff filed with the PHRC, he can maintain his PHRA and PFPO claims.

skinned or mixed race, derogatorily and on multiple occasions." (Id. ¶ 87.) Jakira Jones allegedly "acted condescendingly toward [Plaintiff] and spoke to him as if she were his superior" and called Plaintiff a "child." (Id. ¶¶ 70, 77.)

Regarding supervisors Boring, Gritsko, and Captain Jones, Plaintiff alleges that they largely ignored his requests for shift changes, failed to take any action in response to his informal complaints, and did not respond to his emails. (See id. ¶¶ 40-41, 49, 60, 67, 75, 92.) Plaintiff also interpreted one of Captain Jones' responses to a shift request as "blaming" Plaintiff for the issues at work and "insinuating" that Plaintiff was the cause of all alleged issues. (Id. ¶ 68.)

Furthermore, regarding the suspension issued after Plaintiff's second incident with Jakira Jones, Plaintiff claims that "reports concerning the incident were fabricated or intentionally misrepresented by a number of individual employees at SEPTA in an effort to harm [Plaintiff] in retaliation for his continued report of discriminatory behavior and opposition to that behavior." (Id. ¶ 82.) He further avers that the suspension was not issued in response to the incident; rather, it was "Defendant SEPTA blam[ing him] for verbal altercations" and was issued in response to his EEO complaint. (Id. ¶¶ 88-89.)

In sum, Plaintiff submits that "[a]t all times, Defendant SEPTA failed to respond to or address [his] multiple complaints of discrimination." (Id. ¶ 101.) "As a result of Defendants' actions, [Plaintiff] felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed" and "was caused to sustain serious and permanent personal injuries, including permanent psychological injuries." (Id. ¶¶ 102-03.) On November 8, 2019, Defendants filed an Answer in which they denied nearly every one of Plaintiff's allegations. (See Doc. No. 10.)

**1.      Defendants' Motion for Summary Judgment**

On December 27, 2020, Defendants filed the Motion for Summary Judgment that is presently before the Court. (Doc. No. 27.) In the Motion, Defendants ask the Court to "grant

summary judgment in [their] favor . . . on each and every one of [Plaintiff's] outlandish claims" because "th[e] entire action is baseless and lacks any evidentiary support." (Id. at 13.)

While Plaintiff's Complaint "puts forward varying theories that his co-workers disliked him and mistreated him because they thought he was white, because they thought he was a light-skinned black person, and perhaps, because he has Hispanic heritage and/or because he is a veteran[,]" Defendants submit that, in actuality, "the vast majority of [Plaintiff's] complaints were not about racial matters—they reflected nothing more than an ongoing series of petty workplace tiffs." (Id. at 11-12.) They aver that Plaintiff "engaged in near-constant interpersonal bickering with his fellow dispatchers, . . . he repeatedly complained to SEPTA about squabbles he had with those co-workers[,]" and he also "was the subject of numerous complaints by the same co-workers." (Id. at 11.)

Defendants then note that "SEPTA thoroughly investigated each complaint and, where appropriate, issued discipline." (Id.) "SEPTA's investigations—and, in some instances, neutral, second-level review of those investigations—repeatedly yielded conclusions that [Plaintiff] and his co-workers violated SEPTA's workplace policies by quarreling with one another, with [Plaintiff] typically found equally or more culpable." (Id.) They point out that "[n]ot once did SEPTA find a single shred of evidence that any of the interpersonal conflicts [Plaintiff] reported had anything to do with his race." (Id.) (emphasis omitted). Moreover, Plaintiff "never raised" any of the race-based complaints "with SEPTA's Equal Employment Office until the very end of his employment." (Id. at 12.) And once Plaintiff filed the EEO complaint, and "SEPTA was in the process of investigating [his] complaint . . . [he] abruptly quit." (Id.)

With all this in mind, Defendants argue that "there is no basis for liability against any of the individual Defendants" on any of Plaintiff's claims. (Id. at 13.) They note that Plaintiff

admitted supervisors Boring, Gritsko, and Captain Jones "had no racial animus toward him, and there is no evidence that a single one of them in any way discriminated or retaliated against him." (Id.)  They also argue that "the allegations [Plaintiff] makes about" coworkers Drayton, Singleton, and Jakira Jones "fall woefully short of the kind of intentional discrimination necessary to support individual liability under the applicable law."  (Id.)

In addressing the specific causes of action in the Complaint, Defendants first assert that Plaintiff's discrimination and hostile work environment claims "all fail for the simple reason that there is not an iota of record evidence that anyone at SEPTA ever said or did anything discriminatory to him."  (Id. at 12.)  They claim the one alleged utterance by Singleton about "light skin privilege" is "not actionable under either a disparate treatment or a hostile work environment theory[,]" and "[t]he remaining allegations . . . are either race-neutral ones about trivial disagreements [Plaintiff] had with his co-workers, or descriptions of things he overheard his co-workers say[.]"  (Id.)

Specifically addressing the discrimination claims, they submit that Plaintiff cannot establish a prima facie case of discrimination because the only identifiable adverse employment action—the one-day suspension—was not issued under "circumstances that a reasonable juror could find create an inference of discrimination."  (Id. at 34.)  "The evidence on which [Plaintiff] must rely . . . . is legally insufficient to create any material fact issue regarding whether he was treated differently because of his race(s)."  (Id. at 35.)  And "to the extent that [Plaintiff] seeks to rely . . . his prima facie case on the fact that he allegedly felt forced to resign[,]" Defendants argue that his resignation does not amount to a constructive discharge "and, therefore, his resignation cannot be an adverse employment action as a matter of law."  (Id. at 39.)

Addressing the hostile work environment claims, Defendants argue that the claims are "factually and legal[ly] deficient" because they are "based on the various trifling feuds in which [Plaintiff] engaged with his co-workers[.]" (Id. at 42.) They describe Plaintiff's "alleged 'hostile' interactions with co-workers" as "quintessential 'petty slights' that had nothing to do with his race." (Id. at 44.) "The slights at issue are, at most, mundane workplace tiffs that cannot support a hostile work environment [claim]. And, [Plaintiff] readily admits that he did not have clean hands in these skirmishes" either. (Id. at 46.)

Next, Defendants argue that Plaintiff's retaliation claims fail "because his only possible protected activity (purporting to complain about discrimination just before he resigned) occurred after he was suspended, precluding any causal relationship between the two events." (Id. at 13.) "To the extent [Plaintiff] seeks to hypothesize that his earlier complaints (some of which briefly mentioned race) form the basis of a retaliation claim," Defendants contend that "the length of time between those complaints and his suspension, coupled with his own intervening misconduct, preclude any reasonable jury finding of causation or pretext." (Id.) "The record, including [Plaintiff's] admissions, confirm that he violated SEPTA's policies by using vulgar language towards coworkers (referring to them as 'shi*bags') and repeatedly quarrelling with them." (Id. at 52.) Therefore, they aver that "[t]here is no evidence showing that [Plaintiff's] one-day suspension was causally related to any protected activity." (Id.)

Regarding the PHRA aiding and abetting claim, Defendants argue that they are entitled to summary judgment because the claim is only asserted against SEPTA who, "independent of the lack of any substantive violation of the PHRA, . . . cannot aid and abet its own [allegedly] unlawful conduct." (Id. at 68) (quotations and citation omitted) (second alteration in original). Finally, as for the claims under Section 1981 and the PFPO, Defendants submit that SEPTA is immune from

liability, and the claims against the individual Defendants are "flawed" for several reasons and cannot proceed. (See id. at 63, 68-69.) In support of their Motion, Defendants attached 32 exhibits. (See Doc. Nos. 28-31.)

### 2. Plaintiff's Response in Opposition to the Motion

On January 15, 2021, Plaintiff filed a Response in Opposition to the instant Motion. (Doc. No. 32.) In the Response, Plaintiff argues that Defendants' Motion should be denied because it "is based upon misapplication of the law, misdirection, and mischaracterization of the facts established during discovery." (Id. at 8.) In Plaintiff's view, "Defendants' Motion asks the Court to ignore entire exhibits and substantial portions of deposition testimony, which if considered, would paint the full picture of the racially hostile work environment Plaintiff was subjected to on a continuing and routine basis despite his protests." (Id.) "Respectfully, Plaintiff suggests the instant Motion is a waste of the parties' and Court's valuable time" and that "a simple review of an accurate account of the record demonstrates the sufficiency of Plaintiff's claims." (Id. at 8-9.)

Regarding the Title VII and PHRA claims, Plaintiff maintains that "Defendants engaged in unlawful employment practices . . . by intentionally discriminating, harassing and retaliating against Plaintiff because of his race, color, and/or ethnicity." (Id. at 17.) "Contrary to the Defendants' assertion," Plaintiff claims he was "subjected to numerous adverse employment actions" when he was "denied training, given numerous administrative warnings, suspended without pay, and denied a transfer which forced him to remain in a position in which he faced unbearable working conditions." (Id. at 18.) Moreover, Plaintiff contends that "harassing conduct based on Plaintiff's race, color, and ethnicity filled the environment of Plaintiff's work area," Plaintiff was "retaliated against for having complained both verbally and in numerous emails," and Defendants "failed to take prompt remedial action" in response to "Plaintiff's repeated reports of discrimination[.]" (Id. at 17, 26-27.)

Regarding the Section 1981 claims, Plaintiff argues that Defendants waived the affirmative defense that SEPTA is immune from liability under 1981 "by failing to raise the defense until they submitted their motion for summary judgment." (Id. at 28.) As such, Plaintiff asks that "summary judgment be denied or in the alternative" he be allowed to amend his Complaint to add Section 1983 claims since "the same . . . facts which support Plaintiff's Section 1981 cause of action" support a Section 1983 claim. (Id. at 29-30.) As for the individual Defendants, Plaintiff maintains that they are liable under Section 1981 regardless of their status as a supervisor or coworker. (See id. at 37.)

Regarding the PHRA aiding and abetting claim, Plaintiff similarly argues that he should be given leave to amend his Complaint "to cure the error of against which party he is moving" because the error Defendants point out "was not raised in a motion to dismiss . . . ." (Id. at 42-43.) Finally, Plaintiff "does not oppose the dismissal of his PFPO claim[s]." (Id. at 43-44.) In support of his Response in Opposition, Plaintiff attached 11 exhibits. (See Doc. No. 33.)

### 3. Defendants' Reply

On January 29, 2021, Defendants filed a Reply. (Doc. No. 37.) Defendants posit that Plaintiff "continues to label objectively trivial squabbles as 'unlawful racial discrimination,' without even attempting to explain how the squabbles were 'unlawful' or based on his race." (Doc. No. 37-1 at 2.) "There is no dispute that [Plaintiff] quarreled with co-workers. Indeed, he sporadically bickered about mundane workplace issues like data entry, a clipboard, talking during work, and SEPTA's cellphone policy." (Id.) Nevertheless, Defendants maintain that "there is nothing in the record to indicate that those quarrels had anything to do with his race(s)." (Id.) (emphasis omitted). At bottom, they assert that "[t]he serious anti-discrimination laws at issue are not vehicles for disgruntled employees like [Plaintiff] to litigate petty slights by co-workers. Yet,

[Plaintiff] is seeking to do just that, suggesting that racially neutral workplace squabbles are somehow actionable." (Id.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show" that no genuine issue of material fact exists and the moving party is thus entitled to judgment as a matter of law. Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).

A disputed issue is "genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party[.]" Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. See Anderson, 477 U.S. at 250. All facts must be viewed in the light most favorable to the non-movant, and all inferences must be drawn in their favor. See Kaucher, 455 F.3d at 423.

## IV. ANALYSIS

As previously stated, Plaintiff asserts twelve claims in his Complaint: discrimination, hostile work environment, and retaliation under Title VII (Counts 1-3), discrimination, hostile work environment, and retaliation under Section 1981 (Counts 4-6), discrimination, retaliation, and aiding and abetting under the PHRA (Counts 7-9), and discrimination, retaliation, and aiding

and abetting under the PFPO (Counts 10-12). (See Doc. No. 1 at 15-30.)

In the instant Motion, Defendants correctly argue that Plaintiff's PFPO claims fail as a matter of law because Defendant SEPTA is immune from liability under that ordinance, and the individual Defendants cannot be liable if SEPTA did not violate the PFPO.[29] For this reason, and because Plaintiff does not oppose dismissal, the Court will grant Defendants' Motion as to those claims in Counts 10-12 and need not address them further. All other claims are discussed seriatim.

## A. Race Discrimination under Title VII and the PHRA

Counts 1 and 7 of the Complaint are asserted against Defendant SEPTA and allege race discrimination under Title VII and the PHRA, respectively. (See Doc. No. 1 at 15, 26.) Title VII[30] and the PHRA[31] both "prohibit an employer from engaging in race discrimination against an employee," and discrimination claims brought under both are analyzed under the McDonnell Douglas burden-shifting framework when deciding a motion for summary judgment. Boykins v. SEPTA, 722 F. App'x 148, 151-52 (3d Cir. 2018).

The burden-shifting framework established by the United States Supreme Court in McDonnell Douglas v. Green first requires that a plaintiff bringing a Title VII claim establish a prima facie case of discrimination.[32] 411 U.S. 792, 802 (1973). To do so, the plaintiff must show that they: (1) are a member of a protected class; (2) were qualified for the position; (3) suffered an

---

[29] See SEPTA v. Philadelphia, 159 A.3d 443, 453-54 (Pa. 2017); Williams v. Aramark Campus LLC, No. 18-5374, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020).

[30] See 42 U.S.C. §§ 2000e-2, et seq.

[31] See 43 P.S. §§ 951, et seq.

[32] As noted above, the McDonnell Douglas standard also applies to PHRA discrimination claims. See Boykins v. SEPTA, 722 F. App'x 148, 152 (3d Cir. 2018) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999); Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995)).

adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Fields v. SEPTA, 445 F. App'x 496, 497 (3d Cir. 2011). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802. If the defendant does advance a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to prove that the reason is pretextual, and the real reason for the adverse action is discrimination. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); Boykins, 722 F. App'x at 152.

Here, the parties do not dispute that Plaintiff meets the first two prongs of a prima facie case—that he is a member of a protected class and was qualified for the position. Rather, they dispute whether Plaintiff establishes the third and fourth prongs. To prove the third prong, Plaintiff must show an adverse employment action that caused "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Yarnall v. Phila. Sch. Dist., 57 F. Supp. 3d 410, 419 (E.D. Pa. 2014) (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999)). The action must be "serious and tangible enough to alter [his] compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quotations and citation omitted). "Petty slights and workplace grievances" are not legally sufficient adverse employment actions. Yarnall, 57 F. Supp. 3d at 421.

To prove the fourth prong—that the adverse action occurred under circumstances giving rise to an inference of discrimination—Plaintiff must "establish some 'causal nexus' between [his] membership in a protected class and the adverse employment action." Jordan v. Southeastern Pa. Transp. Auth., No. 10-3470, 2012 WL 4815414, at *8 (E.D. Pa. Oct. 10, 2012). He can establish

30

a causal nexus by showing that individuals "exhibiting discriminatory animus influenced or participated in the [adverse employment decision]" or, alternatively, that "similarly situated individuals were treated more favorably." Id. (alteration in original) (citations omitted). The ultimate inquiry is "whether [he] is able to establish—through evidence of similarly situated employees being treated more favorably or otherwise—that his protected trait played a role in the employer's decision-making process and had a determinative influence on the outcome of that process." Burton v. Pa. State Police, 990 F. Supp. 2d 478, 505 (M.D. Pa. 2014), aff'd, 612 F. App'x 124 (3d Cir. 2015) (quotations and citation omitted). Plaintiff's "subjective belief that race played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination." Boykins v. SEPTA, No. 16-985, 2017 WL 1355036, at *3 (E.D. Pa. Apr. 13, 2017), aff'd, 722 F. App'x 148 (3d Cir. 2018).

Here, Plaintiff claims that SEPTA subjected him to numerous adverse employment actions when he was "denied training, given numerous administrative warnings, suspended without pay, and denied a transfer which forced him to remain in a position in which he faced unbearable working conditions." (Doc. No. 32 at 18.) He also claims "Defendants constructively discharged [him] by making his conditions at work so unbearable" that he had no choice but to resign, thus constituting another adverse employment action. (Id.) In their Motion, Defendants presume that the suspension is an adverse employment action but claim Plaintiff cannot show "that the suspension occurred in circumstances that a reasonable juror could find create an inference of discrimination." (Doc. No. 27 at 34.) They also argue that "[t]here is no evidence in the record from which a reasonable jury could conclude that [Plaintiff] was constructively discharged and, therefore, his resignation cannot be an adverse employment action as a matter of law." (Id. at 39.)

When viewing all facts in the light most favorable to Plaintiff and drawing all inferences in his favor, he fails to establish a prima facie case of race discrimination because he has not shown that his alleged employment actions were adverse, except for his suspension, or alternatively, that they occurred under circumstances giving rise to an inference of discrimination. Each employment action Plaintiff alleges is discussed seriatim.

### 1. Denial of Training

First, Plaintiff alleges he was denied training. (Doc. No. 32 at 18.) In his attached statement of undisputed material facts ("SUMF"), however, the only factual assertion Plaintiff makes in regard to training is that "Defendant Boring implemented changes related to the training of . . . SEPTA dispatchers which did not improve anything, especially with the training of new hires." (Doc. No. 32-3 ¶ 5.) And in Defendants' Motion, they point to numerous instances in which Plaintiff attended training. (See Doc. No. 27 at 17, 22.)[33] Because no evidence in the record suggests that Plaintiff was in fact denied training, or that any alleged denial of training seriously and tangibly altered his compensation, terms, conditions, or privileges of employment, see Storey, 390 F.3d at 764, this does not constitute an adverse employment action.[34]

Furthermore, there are no facts in the record that suggest any training or denial of training occurred under circumstances giving rise to an inference of discrimination. Plaintiff does not argue that similarly situated individuals were treated more favorably with respect to training, or that

---

[33] Defendants note that Plaintiff discussed going to group training on November 29, 2017 which was run by "SEPTA's Learning Center so that" Plaintiff and his coworkers "could work out [their] differences and learn about respectful behavior." (Doc. No. 27 at 17) (citing Doc. No. 29, Ex. 3 at 3.) They also note that Plaintiff "received additional training concerning SEPTA's anti-discrimination and acceptable workplace behavior policies" on October 10, 2018. (Id. at 22) (citing Doc. No. 30, Ex. 17 at 4.)

[34] See Pagan v. Gonzalez, 430 F. App'x 170, 172 (3d Cir. 2011) ("[D]enial of the training was not an adverse employment action because there was no evidence that the [plaintiff's] work suffered or that her advancement or earning potential was affected.").

Boring—or any others responsible for training—exhibited discriminatory animus. See Jordan, 2012 WL 4815414, at *8. To the contrary, Plaintiff stated that Boring never discriminated against him.[35] Accordingly, any training Defendants allegedly denied Plaintiff was not an adverse employment action and could not have occurred under circumstances that give rise to an inference of discrimination.

### 2. Administrative Warnings

Second, Plaintiff alleges he was "given numerous administrative warnings[.]" (Doc. No. 32 at 18.) Specifically, he avers that there was "disparate treatment regarding investigation into alleged policy violations," and he "received numerous verbal and written warnings and/or reprimands while [Drayton, Singleton, and Jakira Jones] received none . . . ." (Id. at 21.)

A reprimand only constitutes an adverse employment action where it "materially change[s] the terms or conditions of [the plaintiff's] employment." Burton v. Pa. State Police, 612 F. App'x 124, 127 (3d Cir. 2015). Likewise, courts in the Third Circuit have held that workplace investigations and written reprimands do not constitute adverse employment actions if they do not alter employment status. See Rosati v. Colello, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015) (citing

---

[35] The following exchange occurred during Plaintiff's deposition:

> [DEFENSE COUNSEL]: . . . do you allege now that the white supervisors, Lieutenant Gritsko and Boring, as white men, perceived you as black, and they were racist against you as they perceived you as black?
>
> [PLAINTIFF]: No.
>
> . . . .
>
> [DEFENSE COUNSEL]: Did Lieutenant Boring discriminate[] against you because you were black?
>
> [PLAINTIFF]: I don't believe that Lieutenant Boring discriminated against me.

(Doc. No. 28, Ex. 2 at 81:20-82:1, 211:23-212:3.)

<u>Henry v. City of Allentown</u>, No. 12-1380, 2013 WL 6409307, *7 (E.D. Pa. Dec. 9, 2013)) ("Investigations, separate from any negative consequences that may result from them, do not generally constitute adverse employment actions."); <u>Burton</u>, 990 F. Supp. 2d at 502 (holding that written reprimand "d[id] not constitute an adverse employment action because it did not alter [p]laintiff's employment status.").

Here, Plaintiff was involved in six SEPTA Internal Investigations of workplace altercations. (<u>See</u> Doc. Nos. 29, Exs. 5, 8; 30, Exs. 12-13, 18-19, 21; 31, Ex. 27.) In three of the six Internal Investigations, complaints were made that Plaintiff engaged in wrongdoing. (<u>See</u> Doc. Nos. 29, Ex. 5; 30, Exs. 12-13, 19.) Discipline was discussed in three of them (<u>see</u> Doc. No. 30, Exs. 12, 18-19), and a formal, written reprimand was issued in one (<u>see</u> Doc. No. 30, Ex. 21).[36] But as noted above, the six Internal Investigations, standing alone, do not constitute adverse employment actions. <u>See</u> <u>Rosati</u>, 94 F. Supp. 3d at 714. Similarly, the reprimand and/or discipline resulting from the Internal Investigations are not adverse employment actions because Plaintiff does not allege—and nothing in the record suggests—that it altered his employment status as a Transit Police Dispatcher. <u>See</u> <u>Burton</u>, 990 F. Supp. 2d at 502.

Moreover, Plaintiff fails to establish that the circumstances surrounding the reprimand/discipline give rise to an inference of discrimination because he cannot show that similarly situated individuals were treated more favorably.[37] <u>See</u> <u>Jordan</u>, 2012 WL 4815414, at *8. While Plaintiff alleges that he "received numerous verbal and written warnings and/or

---

[36] The one-day suspension without pay is excluded from the discipline/reprimand calculations because it is a separately alleged adverse employment action that is discussed in Section IV.A.3, <u>infra</u>.

[37] In addition, nothing in the record suggests that the reprimand/discipline was issued by individuals who exhibited discriminatory animus. As stated in note 35, <u>supra</u>, Plaintiff himself has stated that Gritsko and Boring did not discriminate against him.

reprimands" while Drayton, Singleton, and Jakira Jones "received none" (Doc. No. 32 at 21), this assertion is contradicted by the evidentiary record. In two Internal Investigation Memoranda regarding altercations between Plaintiff and Drayton, Boring concluded that "both Dispatchers Drayton and [Plaintiff] may have violated policy" by "quarreling with each other and using profanity" in the workplace. (Doc. No. 29, Exs. 5, 8) (emphasis added). After Plaintiff complained to Gritsko about Drayton and Singleton using their cellphones during their shift, both were reprimanded and issued "Counseling and Re-instruction regarding the 'Unauthorized use of a personal electronic device(s) . . . .'" (Doc. No. 30, Ex. 16.) And the Internal Investigation of the first altercation between Plaintiff and Jakira Jones resulted in both individuals receiving a written reprimand for violating SEPTA Policy. (See id., Ex. 21; see also id., Ex. 19.)

Accordingly, the reprimand/discipline Plaintiff received did not constitute adverse employment actions and did not occur under circumstances giving rise to an inference of discrimination.

### 3. Suspension Without Pay

Third, Plaintiff alleges his one-day suspension without pay is an adverse employment action. (See Doc. No. 32 at 18.) According to Plaintiff, Defendants argue a "limited reading of the record does not support a determination that a reasonable jury could find that the record establishes circumstances giving rise to an inference of discrimination." (Id. at 14.) He conversely avers that the suspension did occur under circumstances giving rise to an inference of discrimination, and "[a] full review of the record unequivocally establishes that [he] was treated differently because of his race and color." (Id.) In his view, the fact that he prematurely served his suspension, coupled with the "the temporal proximity of the disciplinary action against [him,] is further suggestive of Defendants['] unclean motives." (Id. at 21.)

In the Motion for Summary Judgment, Defendants argue the suspension is the only identifiable adverse action. (See Doc. No. 27 at 34.) But they maintain that Plaintiff fails on the fourth prong of a prima facie case because, even when the evidence is viewed in his favor, he fails to raise a genuine dispute of material fact that shows the suspension occurred under circumstances giving rise to an inference of discrimination. (See id.) They claim Plaintiff's "alleged interpersonal conflicts with Mr. Drayton, Ms. Singleton, and Ms. Jones could never support any reasonable inference of discrimination, inasmuch as they amount to nothing more than quotidian workplace quarrels and reflect no race-based animus." (Id. at 35 n.108.) And to the extent Plaintiff relies upon the "handful of alleged comments by Mr. Drayton and Ms. Singleton that were racial in nature[,]" Defendants aver that the comments are "stray remark[s] that had nothing to do with the decisionmaking process that led to [Plaintiff's] suspension." (Id. at 36.)

Defendant is correct that Drayton, Singleton, and Jakira Jones' alleged conduct does not help Plaintiff prove the fourth prong of a prima facie case with respect to his suspension because "comments by . . . individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." Walden v. Georgia-Pac. Corp., 126 F.3d 506, 521 (3d Cir. 1997); see also Cridland v. Kmart Corp., 929 F. Supp. 2d 377, 389 (E.D. Pa. 2013) ("Under Third Circuit precedent, 'stray remarks' unconnected from an adverse employment decision are insufficient to show invidious purpose.").

Aside from this evidence, Plaintiff cannot establish a causal nexus between his race and SEPTA's issuance of the suspension. In viewing all facts leading up to Plaintiff's suspension, the record is devoid of evidence that suggests his race played any role in the decision-making process. See Burton, 990 F. Supp. 3d at 505.

In October 2018, Plaintiff was found to have violated three or more SEPTA policies due to his actions and comments. (See Doc. No. 30, Exs. 13-14.) On November 19 and 25, 2018, Jakira Jones and Plaintiff quarreled during their shifts—the former incident resulting in both individuals receiving a written reprimand for violating SEPTA policy. (See id., Exs. 18-19, 21.) On December 31, 2018, in response to the latter incident, and in light of the fact that it was "the third incident involving [Plaintiff] engaging in inappropriate workplace behavior," SEPTA's Police Board of Inquiry ("PBI")—an "independent assessment board"[38]—issued Plaintiff a one-day suspension without pay pursuant to SEPTA's Progressive Discipline Scale. (Id., Ex. 22.)

Plaintiff's Union disputed the suspension on his behalf at various grievance hearings, but the suspension was ultimately upheld by the Inspector of SEPTA's Office of Professional Responsibility because "the Union [did] not present any evidence which suggest[ed] that the discipline issued to [Plaintiff] should be overturned." (Id., Ex. 23 at 2.) The Inspector explained that "the discipline appear[ed] to be the culmination of [Plaintiff's] own conduct and behavior that he ha[d] yet to improve upon. Nothing presented in the investigations or the grievance hearings g[a]ve the appearance of inequity or disparity." (Id.)[39] Finally—and most importantly—Plaintiff admitted that supervisors Boring and Gritsko never discriminated against him.[40]

Accordingly, when viewing the facts in the light most favorable to Plaintiff, he has not shown that his suspension was issued under circumstances that give rise to an inference of discrimination.

---

[38] (Doc. No. 30, Ex. 23 at 2.)

[39] See Section II.A.7, supra.

[40] See supra note 35. Plaintiff makes no allegations of discrimination against the PBI or any other supervisory employees who took part in the Internal Investigations or grievance hearings related to his suspension.

### 4. Denial of a Transfer

Fourth, Plaintiff alleges the denial of "transfers," i.e. his shift change requests, constitute adverse employment actions. (See Doc. No. 32 at 18.) He contends that his supervisors "continually ignored [his] repeated requests to change shifts" which "forced him to remain in a position in which he faced unbearable working conditions." (Id.)

In Friel v. Mnuchin, the court held that the defendant's denial of the plaintiff's shift change requests were not adverse employment actions sufficient to satisfy the third prong of a prima facie case of discrimination. See Friel, 474 F. Supp. 3d at 685-86. The court explained that "[t]he denial of [the plaintiff's] shift change requests . . . did not adversely affect the terms and conditions of his employment. He was not denied a promotion, given significantly different responsibilities, or assigned less work. His salary was unaffected." Id. at 686. The court also noted that "seniority was a reason his requests were denied." Id.

Here, the denial of Plaintiff's shift change requests are not adverse employment actions for the same reasons expressed in Friel. Plaintiff does not argue, and the record does not suggest, that the denials adversely affected the terms and conditions of his employment. Moreover, Boring specifically indicated that Plaintiff's first shift change request was denied for seniority reasons. (See Doc. No. 29, Ex. 8 at 4) ("The transfer of the most junior dispatcher to a coveted tour of duty would be inappropriate and unfair."). And even though Plaintiff claims he was forced to remain in "unbearable working conditions" (Doc. No. 32 at 18), a "less than desirable working condition[]" does not "constitute a legally sufficient adverse employment action to justify relief under Title VII." Yarnall, 57 F. Supp. 3d at 421.

In any event, the denial of Plaintiff's shift change requests did not occur under circumstances giving rise to an inference of discrimination. Plaintiff agrees that his requests for

shift changes were for reasons unrelated to race,[41] and as noted above, Boring denied a request for seniority reasons.  (See Doc. No. 29, Ex. 8 at 4.)  Accordingly, Plaintiff has not shown that there is a genuine dispute of material fact that the denials of his shift change requests constituted adverse employment actions or occurred under circumstances giving rise to an inference of discrimination.

### 5. Constructive Discharge

Lastly, Plaintiff alleges that his resignation amounts to a constructive discharge, and therefore an adverse employment action, because he was subjected to "ongoing discrimination, harassment, and [a] hostile work environment . . . since November 2017[,]" forcing him to resign. (Doc. No. 32 at 18.)  According to Plaintiff, "it is clear that the abusive working environment Plaintiff encountered daily became so intolerable that his resignation qualified as a necessary

---

[41]  At Plaintiff's deposition, the following exchanges occurred:

[DEFENSE COUNSEL]: You made [the 10/26/2017] request and you say, I think it's best that I be moved, . . . you needed to be moved, why?

[PLAINTIFF]: Because I felt as if I was being set up for failure by Denise Singleton and Richard Drayton, that they were manipulating the system to for me to fail.  They were holding back information that was critical and because of my new status, to make me look incompetent.

. . . .

[DEFENSE COUNSEL]: This [11/19/2017 email] appears to discuss one of the things that may have occurred . . . in August and the disagreements in October that you thought warranted a request that you be moved, correct?

[PLAINTIFF]: Yes.

[DEFENSE COUNSEL]: Is there any reference in this letter from you, to your supervisor, Lieutenant Boring, on 11/19/2017, that makes any reference to racial discrimination or color discrimination?

[PLAINTIFF]:  No, not that I see.

(Doc. No. 28, Ex. 2 at 136:17-137:3, 146:10-21.)

response that any reasonable person in his position would take." (<u>Id.</u> at 19.) Conversely, Defendants argue that "the evidence [Plaintiff] has proffered in this matter does not come close to meeting the standard for a constructive discharge." (Doc. No. 27 at 40.) "[T]here is nothing in the record that could possibly support a reasonable jury finding that [he] suffered an 'intolerable' working environment." (<u>Id.</u> at 41.)

Constructive discharge can act "as the functional equivalent of an actual termination[.]" <u>Angeloni v. Diocese of Scranton</u>, 135 F. App'x 510, 513 (3d Cir. 2005) (quotations and citation omitted). It "requires a finding that 'the employer knowingly permitted a condition of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" <u>Gunn v. On the Border Acquisitions, LLC</u>, 298 F. Supp. 3d 811, 823 (E.D. Pa. 2018) (quoting <u>Angeloni</u>, 135 F. App'x at 513). In other words, a plaintiff must show that "the alleged discrimination goes beyond a 'threshold of intolerable conditions.'" <u>Angeloni</u>, 135 F. App'x at 513 (internal quotations and citation omitted).

When assessing whether the employee was constructively discharged, courts look to "whether the employer (1) threat[en]ed [the employee] with discharge or urge[d] or suggest[ed] that she resign or retire, (2) demote[d] her, (3) reduce[d] her pay or benefits, (4) involuntarily transferred [her] to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations[.]" <u>Gunn</u>, 298 F. Supp. 3d at 824 (citing <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 502 (3d Cir. 2010)). "[T]he test for constructive discharge is an objective one." <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1086 (3d Cir. 1992). "[A]n employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 169 (3d Cir. 2013) (citing <u>Gray</u>, 957 F.2d at 1083).

Here, Plaintiff does not present any evidence, and nothing in the record suggests, that he (1) was threatened with discharged or urged to resign, (2) was demoted, (3) suffered a reduction in pay or benefits, (4) was involuntarily transferred, (5) received altered job responsibilities, or (6) was given unsatisfactory evaluations.[42]  See Gunn, 298 F. Supp. 3d at 824.  And despite Plaintiff's subjective perceptions of a harsh working environment, see Mandel, 706 F.3d at 169, "employees are not guaranteed stress-free environments and . . . discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting."  Gunn, 298 F. Supp. 3d at 823 (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)).

Finally, while the Third Circuit has held that "constructive discharge may occur 'when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it,'" Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 168 (3d Cir. 2001) (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996)), every time Plaintiff complained to Boring, Gritsko, and/or Captain Jones, they promptly initiated and conducted an internal investigation and took steps to temper the situation.  (See Doc. Nos. 29, Ex. 8; 30, Exs. 9, 16, 18-20; 31, Ex. 27.)[43]  Therefore, Plaintiff has not proven that his resignation

---

[42]  Notably, Plaintiff received a satisfactory work evaluation in 2018.  (See Doc. No. 30, Ex. 24.)

[43]  Plaintiff also claims that he suffered from "unmanageable stress, anxiety, and depression as a result of the discrimination and harassment he faced" (Doc. No. 32 at 19), but this contention does not support a claim of constructive discharge either.  See Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 170 (3d Cir. 2001) ("Duffy's attempt to use her physician's opinion that her job had an adverse affect [sic] upon her health to prove that her working conditions were intolerable also fails.  These health problems support an inference that Duffy's environment was stressful.  However, . . . a stressful environment does not amount to constructive discharge.").

constitutes a constructive discharge, hence it is not an adverse employment action.[44]

For all these reasons, when viewing the facts in the light most favorable to Plaintiff, he has failed to show that there is a genuine dispute of material facts on the third and fourth prongs of a prima facie case of race discrimination. Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's discrimination claims under Title VII and the PHRA.[45]

---

[44] Because Plaintiff's resignation is not a constructive discharge and thus not an adverse employment action, the fourth prong of a prima facie case need not be addressed in full since "there is no claim for [discrimination] without an adverse employment action." Shamsuddi v. Classic Staffing Servs., No. 19-3261, 2020 WL 7700184, at *5 (E.D. Pa. Dec. 28, 2020). The Court only notes that, upon full review of the record, the "surrounding circumstances" of Plaintiff's resignation do not "indicate a pattern of discriminatory treatment." Jones, 198 F.3d at 412; see also Section IV.A.3, supra. And to the extent Plaintiff relies upon evidence of a former coworker, Jonina Respes, resigning because of the same "abusive working environment" that became "intolerable" (Doc. No. 32 at 19), this "do[es] not bolster [Plaintiff's] own testimonial evidence sufficiently to prove that SEPTA operated with an underlying motive of racial discrimination." Boice v. Southeastern Pa. Transp. Auth., No. 05-4772, 2007 WL 2916188, at *10 (E.D. Pa. Oct. 5, 2007).

[45] It is worth noting that, even if Plaintiff could establish a prima facie case of race discrimination, Defendants would still be entitled to summary judgment because Plaintiff cannot prove that SEPTA's legitimate, nondiscriminatory reasons for its employment actions were pretextual. For each alleged adverse employment action Plaintiff raises, SEPTA is able to meet its "relatively light burden" of articulating a legitimate, nondiscriminatory reason through the evidentiary record, "which would allow the trier of fact rationally to conclude that the employment decision[s] had not been motivated by discriminatory animus." Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 823 (E.D. Pa. 2005), aff'd, 245 F. App'x 184 (3d Cir. 2007) (first quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); then quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981)).

"[W]hen the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Plaintiff cannot do so, as all of his proffered facts are unsupported by the evidentiary record, and his own testimony regarding discriminatory treatment cannot "demonstrate invidious intent at the summary judgment stage." Cridland v. Kmart Corp., 929 F. Supp. 2d 377, 389-90 (E.D. Pa. 2013) (citing Solomon v. Soc'y of Auto. Eng'rs, 41 F. App'x 585, 586 (3d Cir. 2002) (granting summary judgment for the defendant-employer because "the only evidence in support of [plaintiff's] claims was [his] own testimony.")).

## B.     Hostile Work Environment under Title VII

Count 2 of the Complaint is asserted against Defendant SEPTA and alleges a hostile work environment under Title VII.  (See Doc. No. 1 at 16.)  A plaintiff alleging a Title VII hostile work environment claim must establish that: (1) they "suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability."  Selvato v. SEPTA, 658 F. App'x 52, 55 (3d Cir. 2016) (quoting Mandel, 706 F.3d at 165).  "The first four elements establish a hostile work environment, and the fifth element determines employer liability."  Davis v. Southeastern Pa. Transp. Auth., No. 13-6864, 2016 WL 97922, at *5 (E.D. Pa. Jan. 8, 2016) (quoting Mandel, 706 F.3d at 167).

In the instant Motion, Defendants argue that Plaintiff's hostile work environment claim fails for several reasons.  First, they aver that Plaintiff's interpersonal conflicts with Drayton, Singleton, and Jakira Jones cannot support a hostile work environment claim because they "have nothing to do with his race" and because Plaintiff "did not have clean hands in the[] skirmishes . . . ." (Doc. No. 27 at 46.)[46]  Second, they submit that Plaintiff's reliance on "alleged comments by co-workers that he admits were not even directed at him, and that he alleges were only said in his presence," cannot support a hostile work environment claim.  (Id.)  Third, they argue that the one comment Plaintiff claims Singleton directed at him about "light skin privilege" was an isolated incident that "is not enough to meet the high standard for a viable hostile work environment claim."

---

[46]  In support of their contention, Defendants point to (1) the June 2018 altercation between Plaintiff and Drayton, (2) Plaintiff's allegations about Singleton sighing, rolling her eyes, and smacking her teeth, and (3) the "isolated quarrels" with Jakira Jones—who Plaintiff later stated "never made a racist remark to [him]."  (Doc. No. 27 at 44-46) (citing Doc. No. 29, Ex. 2 at 249:7-8.)

(Id. at 48-49.)  Finally, Defendants aver that SEPTA is not liable because "it took all appropriate steps in response to [Plaintiff's] complaints" about Drayton, Singleton, and Jakira Jones by "hearing, investigating, and addressing" them.  (Id. at 49-50.)

In his Response in Opposition, Plaintiff maintains that "the totality of Defendants' acts in this case occurred with regularity and were pervasive." (Doc. No. 32 at 23.) According to Plaintiff, "Defendants consistently [and] improperly conclude that the conduct and comments engaged in were trivial or 'various trifling feuds,'" when "it is clear that the Defendants' conduct does in fact rise to the level of severe and/or pervasive conduct under federal law, state, and city law." (Id.)

A full review of the record shows that the chief defect in Plaintiff's hostile work environment claim lies in the second prong of proving a prima facie case.  When viewing all the facts in the light most favorable to Plaintiff and drawing all inferences in his favor, he cannot show that there is a genuine dispute of material fact as to his hostile work environment claim because the conduct he points to does not rise to the high threshold for severity and pervasiveness.  See Davis, 2016 WL 97922, at * 8.

To prove the second prong, a plaintiff must show that the "workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" such that it "amount[ed] to a change in the terms and conditions of employment."  Perry v. Harvey, 332 F. App'x 728, 730-31 (3d Cir. 2009) (internal quotations and citations omitted).  Severity and pervasiveness "are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."  Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017). Courts "must concentrate not on individual incidents, but on the overall scenario" id. at 731, and must consider not only "the frequency of the discriminatory conduct" and "its severity[,]" but also

"whether it is physically threatening or humiliating, or a mere offensive utterance[,] and whether it unreasonably interferes with [the plaintiff's] work performance." Burgess v. Dollar Tree Stores, Inc., 642 F. App'x 152, 155 (3d Cir. 2016) (quotations omitted) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). "[I]t is not sufficient for [the plaintiff] to have subjectively perceived the harassment as severe or pervasive; the conduct in question must also be so severe or pervasive that it creates an objectively hostile work environment." Brooks v. CBS Radio, Inc., 342 F. App'x 771, 776 (3d Cir. 2009).

### 1.     Severity

To begin with, the conduct Plaintiff complains of is not objectively severe. "Discriminatory behavior must be sufficiently severe to establish a hostile work environment." Greer v. Mondelez Glob., Inc., 590 F. App'x 170, 173 (3d Cir. 2014). "Simple teasing, offhand comments, and isolated incidents do not amount to discriminatory changes in the terms and conditions of employment." Id. (internal quotations and citations omitted). "Mere offensive utterances" are also insufficient, "even if they engender offensive feelings in an employee." Id.; see also Selvato v. SEPTA, 143 F. Supp. 3d 257, 266 (E.D. Pa. 2015) ("Title VII does not extend to all workplace difficulties, even where the conduct at issue may be crass and unwarranted."). This is because "Title VII is not intended as a 'general civility code[.]'" Burgess, 642 F. App'x at 155 (quoting Faragher, 524 U.S. at 787-88). It "protects against intentional discrimination because of one's [race,]" but "does not protect against all insults or personal animosity in the workplace." Davis, 2016 WL 97922, at *6.

Here, Plaintiff complained of Drayton, Singleton, and Jakira Jones embarrassing him, "setting him up for failure," acting "very rude" towards him, alienating him, yelling in a "smug" manner, withholding information to "make [him] look incompetent," "challenging [his] manhood," and "eye rolling, teeth sucking, [and] loud sighs" when he talked to them. (See Doc.

Nos. 28, Ex. 2 at 136:17-137:3; 29, Ex. 7; 30, Exs. 18-19; 31, Ex. 27 at 2; 33, Exs. C, E.) In one altercation, he specifically alleged that Drayton called him "stupid" and told him to "go f*ck himself." (Doc. No. 30, Ex. 10.) Moreover, Plaintiff complained of things he overheard, such as Drayton and Singleton joking about someone being "mulatto," Drayton using the "'N-word' several times while talking to other officers about an arrest," and Singleton commenting about "light skin privilege." (See Doc. Nos. 29, Ex. 6; 31, Ex. 27 at 2.)

Even when viewing the facts in the light most favorable to Plaintiff and drawing all inferences in his favor, all alleged conduct was most certainly "unprofessional and inappropriate for the workplace, . . . [but it was] not objectively lewd, and [was], at most, merely offensive." Harrison-Harper v. Nike, Inc., No. 16-4645, 2018 WL 4614158, at *6 (E.D. Pa. Sept. 24, 2018), aff'd, 788 F. App'x 846 (3d Cir. 2019). The conduct also was not physically threatening or humiliating, see Faragher, 524 U.S. at 787-88, and does not raise a genuine dispute of material fact on the element of severity. Therefore, it cannot be said that the conduct was sufficiently severe.[47]

## 2. Pervasiveness

The conduct of Defendants also is not objectively pervasive. "Title VII is violated only '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . .'" Burgess, 642 F. App'x at 155 (emphasis added) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Race-based harassment "must be more than episodic; [it] must be sufficiently

---

[47] Indeed, the conduct Plaintiff complains of is similar to conduct courts have found to be not severe. See, e.g., Doe v. Triangle Doughnuts, LLC, 472 F. Supp. 3d 115, 131 (E.D. Pa. 2020) (allegations of coworkers calling the transgender female plaintiff "boy," "a 'n-gga,' and stating that [the plaintiff] would 'get [her] ass beat up[]'" not sufficiently severe); Shaw v. Temple Univ., 357 F. Supp. 3d 461, 475 (E.D. Pa. 2019) (plaintiff's overhearing defendant use "racial and misogynistic language against minority co-workers" not severe); Woodard v. PHB Die Casting, 255 F. App'x 608, 609 (3d Cir. 2007) (racist graffiti and "racially insensitive comments" such as plaintiff being referred to as "you people" and being "asked what his race was" not severe); but see Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d 422, 428 (E.D. Pa. Apr. 28, 2010) (male co-worker holding a knife to the plaintiff's breast was "severe").

continuous and concerted in order to be deemed pervasive[.]" Faragher, 524 U.S. at 787 n.1 (quotations and citations omitted); see also Barbosa v. Trib. Co., No. 01-1262, 2003 WL 22238984, at *3 (E.D. Pa. Sept. 25, 2003) (emphasis added) (quotations and citation omitted) ("For racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments.").

Here, over the 17-month period of Plaintiff's employment, there are a total of 13 identifiable incidents Plaintiff complained of,[48] 11 of which he brought to the attention of his supervisors. Of these 13 incidents, 8 involved actions or comments that were directed at Plaintiff,[49] and 5 involved race-related remarks that were overheard by Plaintiff but were not directed at him.[50] While it is clear Plaintiff complained "more than a handful of times," he does not present any evidence showing the discriminatory harassment occurred "on a daily or even weekly basis." Harrison-Harper, 2018 WL 4614158, at *7. Likewise, Plaintiff's allegation in his EEO complaint that he was "constantly working in a hostile environment where [he was] routinely disrespected and subject to discriminatory harassment" (Doc. No. 31, Ex. 25 at 1) is unavailing, as he has not presented any evidence to corroborate his claims of "constant" and "routine" harassment, and as previously stated, he "cannot rely on conclusory statements to defeat summary judgment." Barbosa, 2003 WL 22238984, at *4 n.15.

---

[48] There is one additional instance where Plaintiff complained to Captain Jones of Drayton and Singleton using their cell phones during their shift in violation of workplace policy. (See Doc. No. 30, Ex. 16.) This instance is not considered, however, because it does not involve conduct that Plaintiff claimed affected him in any way, and appears only to be Plaintiff telling on his coworkers.

[49] (See Doc. Nos. 28, Ex. 2 at 78:3-13; 29, Ex. 7; 30, Exs. 10, 18-19; 31, Ex. 27; 33, Exs. C, E.)

[50] (See Doc. Nos. 28, Ex. 2 at 206:86-23; 29, Exs. 3, 6.)

Therefore, even when drawing all inferences in Plaintiff's favor, he has failed to show that the conduct was pervasive because the overall scenario does not show "continuous and concerted" harassment. Faragher, 524 U.S. at 787 n.1. This is especially true when only considering the eight incidents that were actually directed at Plaintiff.[51] See Phillips v. SEPTA, No. 16-0986, 2018 WL 827440, at *6 (E.D. Pa. Feb. 12, 2018) (six remarks and discriminatorily suggestive conduct "on multiple occasions" by coworkers insufficient to establish second prong of a hostile work environment claim); Stephenson v. City of Philadelphia, No. 05-1550, 2006 WL 1804570, at *11 (E.D. Pa. June 28, 2006), aff'd, 293 F. App'x 123 (3d Cir. 2008) (nine sporadic incidents over nineteen months insufficient to establish second prong); Barbosa, 2003 WL 22238984, at *3 (seven specific comments during eighteen months of employment insufficient to establish the second prong).

At bottom, "[a]n unpleasant work environment is not a good thing, but it is not necessarily actionable, either." Burgess, 642 F. App'x at 155; see also Davis, 2016 WL 97922, at *8 ("Not all workplace conduct that may be described as harassment rises to the level of a hostile work environment."). Because "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing do not support a hostile work environment claim," Perry, 332 F. App'x at 731 (quotations omitted) (quoting Faragher, 524 U.S. at 788), Plaintiff cannot withstand summary judgment. When viewing the facts in the light most favorable to him and drawing all inferences in his favor, Plaintiff has not raised a genuine dispute of material fact because the conduct he complains of "does not reach the level of permeating

---

[51] The five incidents involving remarks overheard by Plaintiff do not aid to a finding of pervasiveness because "occasional derogatory comments not intentionally directed at a plaintiff, but simply overheard by a plaintiff, are not sufficient to establish a hostile work environment." Lamb v. Montgomery Twp., 734 F. App'x 106, 112 n.8 (3d Cir. 2018).

intimidation, ridicule, and insult necessary to be considered severe or pervasive for purposes of Title VII." Burgess, 642 F. App'x at 155.

Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's hostile work environment claim.[52]

## C.      Retaliation under Title VII and the PHRA

Counts 3 and 8 of the Complaint allege retaliation under Title VII and the PHRA, respectively. (See Doc. No. 1 at 19, 26.) The Title VII retaliation claim is asserted against Defendant SEPTA, and the PHRA claim is asserted against all Defendants.[53] (See id.) Both claims

---

[52] Because Plaintiff has not established the second prong of a hostile work environment prima facie case, it is unnecessary to address prongs one, three, and four. And insofar as Plaintiff argues the fifth prong of a prima facie case—that SEPTA is vicariously liable for Drayton, Singleton, and Jakira Jones' conduct—Plaintiff has not presented sufficient facts to support this prong because he would need to prove that SEPTA "failed to provide a reasonable avenue for complaint" or "should have known of the harassment and failed to take prompt and appropriate remedial action." Opper v. Fred Beans Motors of Doylestown, Inc., No. 18-4230, 2019 WL 4242627, at *7 (E.D. Pa. Sept. 6, 2019) (quoting LaRochelle v. Wilmac Corp., 769 F. App'x 57, 61 (3d Cir. 2019)).

A full review of the record shows that each time Plaintiff emailed a supervisor, they either responded to his email or initiated an internal investigation within days of receiving the complaint. (See Doc. Nos. 29, Ex. 8; 30, Exs. 9, 16, 18-20; 31, Ex. 27; 33, Exs. D-F.) Moreover, Plaintiff, Drayton, Singleton, and Jakira Jones all participated in a counseling session in 2017 and informational session on workplace behavior in 2018 because of Plaintiff's complaints. (See Doc. Nos. 30, Ex. 17; 33, Ex. F.) Therefore, at the summary judgment stage and under its standard, SEPTA has shown that "its supervisory employees investigated [P]laintiff's complaints and took appropriate action . . . ." Opper, 2019 WL 4242627, at *7; see also Griffin v. Harrisburg Prop. Servs., Inc., 421 F. App'x 204, 209 (3d Cir. 2011) (quotations and citation omitted) ("An employer's remedial action is adequate if it is reasonably calculated to prevent further harassment."); Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 549 (W.D. Pa. 2009) ("When each incident underlying [the plaintiff's] complaints is examined in context and considered in conjunction with the responsive actions taken by [the employer], the record fails to reflect sufficient evidence of discriminatory treatment based on race" to establish a hostile work environment claim).

[53] The individual Defendants cannot be liable for retaliation under the PHRA because they can only be held liable for aiding and abetting under the PHRA, codified in 43 P.S. § 955(e), "which forbids, 'any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful

are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Boykins</u>, 722 F.

App'x at 156.

First, a plaintiff must establish a prima facie case of retaliation by showing that: (1) he

engaged in a protected activity; (2) the employer took an adverse employment action either after

or contemporaneous with the protected activity; and (3) a causal connection exists between the

protected activity and the adverse action.  <u>See</u> <u>id.</u>  If the plaintiff is successful, the burden shifts to

the employer to articulate a legitimate, nondiscriminatory reason for the action taken.  <u>See</u> <u>id.</u>  If

the employer does proffer a legitimate, nondiscriminatory reason, the burden shifts back to the

plaintiff to "demonstrate that 'the employer's proffered explanation was false, and that retaliation

was the real reason for the adverse employment action.'"  <u>Id.</u> at 156-57 (quoting <u>Daniels v. Sch.</u>

<u>Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015)).  At the summary judgment stage, an employer

can prevail by showing that "the trier of fact could not conclude, as a matter of law, (1) retaliatory

animus played a role in the employer's decision making process, and (2) that it had a determinative

effect on the outcome of that process."  <u>Dodd v. SEPTA</u>, No. 06-4213, 2008 WL 2902618, at *12

(E.D. Pa. July 24, 2008).

In the instant Motion, Defendants argue that Plaintiff cannot establish a prima facie case of

retaliation because he cannot prove the third prong—the causal connection between protected

activity and adverse action.  (<u>See</u> Doc. No. 27 at 53.)  They presume the one-day suspension

without pay is the adverse action, and submit that Plaintiff's "only possible protected activity

---

discriminatory practice . . . .'"  <u>Brzozowski v. Pa. Tpk. Comm'n</u>, 165 F. Supp. 3d 251, 262-63
(E.D. Pa. 2016), <u>aff'd</u> <u>as</u> <u>modified</u>, 738 F. App'x 731 (3d Cir. 2018) (quoting 43 P.S. § 955(e)).
Put differently, the individual Defendants can be held liable under the PHRA for aiding and
abetting SEPTA's retaliation, but they cannot be held liable for the retaliation itself.  Therefore,
the Court will only consider the PHRA retaliation claim as against Defendant SEPTA.  <u>See</u>
<u>Thomas v. St. Mary Med. Ctr.</u>, 22 F. Supp. 3d 459, 467-68 (E.D. Pa. 2014).

(purporting to complain about discrimination just before he resigned) occurred after he was suspended, precluding any causal relationship between the two events." (Id. at 13) (emphasis omitted). And even if Plaintiff could establish a prima facie case, they maintain that summary judgment should be entered in their favor because, "[t]o the extent [Plaintiff] seeks to hypothesize that his earlier complaints . . . form the basis of a retaliation claim, the length of time between those complaints and his suspension, coupled with his own intervening misconduct, preclude any reasonable jury finding of causation or pretext." (Id.)

Conversely, Plaintiff contends that he "opposed unlawful discrimination and was then retaliated against for having complained both verbally and in numerous emails." (Doc. No. 32 at 26.) Plaintiff accuses Defendants of "manipulat[ing] the record to suggest that even Plaintiff does not believe that anyone was discriminating against him due to his race." (Id. at 27.) But "a full review of the record clearly shows . . . that [Plaintiff] tried to give Defendants the benefit of the doubt. When that did not work, he tried to have the issues dealt with at the lowest level." (Id.) And "when that was unsuccessful, he escalated his concerns." (Id.) According to Plaintiff, "[i]t was this repeated opposition and outspokenness that was clearly the reason, or at very least a jury could find was the reason, Defendants began a campaign of retaliatory disciplinary actions." (Id.)

As an initial matter, both parties consider Plaintiff's one-day suspension without pay to be an adverse employment action[54] (see Doc. Nos. 27 at 13; 32 at 27); therefore, only the first and

---

[54] While Plaintiff claims he suffered a "campaign of retaliatory disciplinary actions," to the extent he is referring to the Internal Investigations, they do not constitute adverse employment actions. See Dodd v. SEPTA, No. 06-4213, 2008 WL 2902618, at *14 (E.D. Pa. July 24, 2008) ("[T]he internal affairs investigation does not constitute an adverse employment action. . . . the investigation alone is nothing more than what is to be expected following allegations of institutional misconduct."). And to the extent he is referring to the two reprimands he received prior to his suspension, they also do not constitute adverse employment actions. See Caver v. City of Trenton, 420 F.3d 243, 255 (3d Cir. 2005) (citation omitted) ("'[U]nsubstantiated oral reprimands' and 'unnecessary derogatory comments' are not serious and tangible enough to

third prongs of the prima facie case are at issue—whether Plaintiff engaged in protected activity prior to his suspension, and whether there exists a causal link between any protected activity and the suspension.

### 1.    Protected Activities

To establish the first prong of a prima facie case of retaliation, Plaintiff must prove he engaged in a protected activity.  "The Third Circuit has held that formal and informal complaints of discrimination, which includes harassment, constitute protected activities."  Smith v. RB Distrib., Inc., No. 20-900, 2020 WL 6321579, at *10 (E.D. Pa. Oct. 28, 2020) (citing Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001)).  Examples include "making complaints to management, writing critical letters to customers, [and] protesting against discrimination by industry or society in general."  Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006).  "A general complaint of unfair treatment," however, "is insufficient to establish protected activity under Title VII."  Id.  The "complaint[] must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'"  Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010) (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)).

In this case, Plaintiff emailed seven informal complaints to his supervisors before his suspension:

(1) October 26, 2017 email to Boring regarding Drayton;

(2) November 19, 2017 email to Boring regarding Drayton and Singleton;

(3) November 21, 2017 email to Boring regarding Drayton and Singleton;

---

constitute adverse employment actions."); see also Boss v. Castro, 816 F.3d 910, 919 (7th Cir. 2016) (holding that "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences," are not adverse employment actions).

(4) February 3, 2018 email to Boring regarding Singleton;

(5) June 28, 2018 email to Boring regarding Drayton and Singleton;

(6) November 20, 2018 email to Gritsko and Captain Jones regarding Jakira Jones; and

(7) November 26, 2018 email to Gritsko regarding Jakira Jones.

(See Doc. Nos. 29, Exs. 6-7; 30, Exs. 10, 18-19; 33, Exs. C, E.)  Of these seven informal complaints, only three notified supervisors of alleged race discrimination and/or complained of a hostile work environment: the emails sent on November 19, 2017, June 28, 2018, and November 20, 2018.  (See Doc. Nos. 30, Exs. 10, 19; 33, Ex. E.)

In the November 19, 2017 email, Plaintiff stated that he believed Drayton and Singleton's conduct "creates a work environment that a reasonable person would consider intimidating, hostile and abusive, that no one should have to work in."  (Doc. No. 33, Ex. E.)  In the June 28, 2018 email entitled "Hostile work environment Complaint," Plaintiff stated that "[d]erogatory things about [his] complexion [were] being whispered and said loudly," his "out of control coworkers . . . caus[ed] a hostile work environment," and he was "tired of the derogatory remarks and slurs based on [his] complexion[.]" (Doc. No. 30, Ex. 10 at 1-2.)  And in the November 20, 2018 email, Plaintiff stated he "believe[d] [he was] being targeted because of [his] racial status or veteran status or both." (Id., Ex. 19 at 5.)  These statements convey Plaintiff's "express or implicit protest of discriminatory practices that violate the federal anti-discrimination statutes."  Jordan, 2012 WL 4815414, at * 11 (quotations and citation omitted).  Therefore, these three informal complaints are protected activity.

Four other informal complaints neither explicitly nor implicitly allege race discrimination or a hostile work environment.  In the October 26, 2017 email, Plaintiff generally complained of Drayton's "offensive" behavior against him by Drayton "intentionally set[ting Plaintiff] up for

failure, embarrassment, ridicule, and [being] talked about to Transit Police and other dispatchers in a disparaging way by him via text [messages] and in the office . . . ." (Doc. No. 33, Ex. C.) In the November 21, 2017 email, Plaintiff claimed he overheard Drayton and Singleton use the word "mulatto" in conversation and he found it to be "very offensive."[55] (Doc. No. 29, Ex. 6.) In the February 3, 2018 email, Plaintiff alleged that Singleton was "intentionally or negligently setting [him] up for failure." (Id., Ex. 7.) And in the November 26, 2018 email, Plaintiff accused Jakira Jones of "challenging [his] manhood with her comments . . . trying to provoke a response from [him]," and he did not "understand the hostility." (Doc. No. 30, Ex. 18 at 1-2.) These complaints consist of vague allegations of unfair treatment and make no mention of a race discrimination; therefore, they do not constitute protected activity. See Collins v. Kimberly-Clark Pa., LLC, 247 F. Supp. 3d 571, 601-02 (E.D. Pa. 2017), aff'd, 708 F. App'x 48 (3d Cir. 2017).[56]

In any event, the three informal complaints Plaintiff made before his suspension constitute protected activity that satisfies the first prong of a prima facie case of retaliation.[57] The focus now

---

[55] Even though the use of the word "mulatto" can be construed as a race-related comment, this allegation in Plaintiff's November 21, 2017 email is not protected activity because the word was not directed at Plaintiff, and "no reasonable person could . . . believe[] that the underlying incident complained about constitute[s] unlawful discrimination[.]" Mufti, 667 F. Supp. 2d at 553 (quotations omitted) (quoting Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

[56] See also Mikell v. Marriott Int'l, Inc., 789 F. Supp. 607, 619 (E.D. Pa. 2011) (finding that the plaintiff's complaint "that he was 'being discriminated against,' that there was 'a conspiracy to get [him] out,' that he was 'being constantly harassed with frivolous write-ups,' and that 'things of that nature' were taking place" did not constitute protected activity because it "did not invoke race."); cf. Dodd, 2008 WL 2902618, at *13 (finding that the plaintiff's statement "that he was being 'discriminated against about [his] hair[]' constituted protected activity because he claimed it "implicate[d] SEPTA's non-discrimination policy because '[t]his hair style has been and still is popular with the Afro-American community[]'" and he "implicitly connect[ed] the alleged adverse actions to his race.").

[57] Of note, Defendants correctly point out that Plaintiff's EEO complaint does not constitute protected activity that the Court can consider for purposes of the retaliation claim because he

54

turns to whether there exists a causal connection between Plaintiff's protected activity and his suspension.

### 2. Causal Connection Between Protected Activity and Adverse Action

To establish the third prong of a prima facie case, "a plaintiff must introduce evidence about the 'scope and nature of conduct and circumstances that could support the inference' of a causal connection between the protected activity and adverse action." Larochelle v. Wilmac Corp., 769 F. App'x 57, 65 n.19 (3d Cir. 2019) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)). Plaintiff can rely on a "broad array of evidence" to do so. Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007). "In assessing this, courts generally consider two factors: (1) the 'temporal proximity' between the protected activity and the alleged retaliatory response, and (2) the existence of a pattern of antagonism in the intervening period." Dodd, 2008 WL 2902618, at *15 (internal quotations and citation omitted).

"Temporal proximity alone may be sufficient to establish the causal connection required for the prima facie case" id., but "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Jones, 796 F.3d at 331 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). The Third Circuit has "declined to establish a bright line rule dictating a specific amount of time" that is unusually suggestive of temporal proximity. Morrin v. Torresdale Frankford Country Club, No. 07-5527, 2008 WL 2389469, at *7 (E.D. Pa. June 11, 2008). Instead, temporal proximity should be viewed "with perspective on relevant context" since "the causation inquiry is 'highly context-specific[.]'"

---

filed the EEO complaint after he was suspended. (See Doc. No. 27 at 54); see also Jones, 198 F.3d at 415; Mikell, 789 F. Supp. 2d at 620 (finding that the plaintiff's formal complaint "could not serve as a basis for a retaliation claim" because it was filed after he was suspended and subsequently terminated).

Collins, 247 F. Supp. 3d at 599 n.24 (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)).

Here, in viewing the relevant context in the light most favorable to Plaintiff, he has not raised a genuine dispute of material fact that the temporal proximity between his protected activity and his suspension is "unusually suggestive" of retaliatory motive. There is a 41-day gap between Plaintiff's November 20, 2018 informal complaint[58] regarding the first altercation with Jakira Jones, and SEPTA's issuance of his one-day suspension on December 31, 2018. (See Doc. No. 30, Exs. 19, 22.) The following events occurred during that time period:

- November 21: internal investigation commences in response to the first altercation with Jakira Jones

- November 26: Plaintiff emails Gritsko regarding the second altercation with Jakira Jones

- November 28: internal investigation commences in response to the second altercation

- December 13: Both investigations conclude; Plaintiff is found in violation of policy for both altercations, Jakira Jones is found in violation for the first altercation[59]

- December 31: The PBI convenes to review the second altercation/investigation and issues Plaintiff a one-day suspension in accordance with SEPTA's Progressive Discipline Scale

(See id., Exs. 18-19, 21-22.)

These facts show that, during the 41-day gap between Plaintiff's November 20, 2018 email and December 31, 2018 suspension, SEPTA was investigating—and subsequently reviewing—the

---

[58] This is the last informal complaint Plaintiff sent prior to his suspension that constitutes protected activity.

[59] The investigation of the first altercation found both Plaintiff and Jakira Jones violated policy, but they were not issued a formal, written reprimand until January 12, 2019. (See Doc. No. 30, Ex. 21.) This delay is due to the PBI's subsequent review of the investigation. (See id.)

two altercations between Plaintiff and Jakira Jones. For this reason, temporal proximity alone cannot establish a causal connection. See Jones, 796 F.3d at 331 ("We reject Jones's suggestion that a gap of nearly three months (between Jones's harassment complaint and SEPTA's determination that she committed timesheet fraud) raises a red flag, especially when SEPTA spent those three months on a thorough investigation into her alleged malfeasance.").[60]

When temporal proximity is insufficient evidence of a causal link, "courts may look to the intervening period" for other evidence, such as "actual antagonistic conduct or animus against the employee, or . . . inconsistent reasons given by the employer for [suspending] the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." Marra, 497 F.3d at 302.[61] No such evidence has been presented here. To the contrary, as shown above, the intervening period was spent investigating the altercations between Plaintiff and Jakira Jones which is "is nothing more than what is to be expected following allegations of" workplace misconduct. Dodd, 2008 WL 2902618, at *14. Moreover, SEPTA has only provided one reason for Plaintiff's suspension—it was in accordance with the Progressive Discipline Scale due to Plaintiff's third engagement in "inappropriate workplace behavior." (Doc. No. 30, Ex. 22.)

---

[60] See also Dodd, 2008 WL 2902618, at *14 ("Although the investigation ultimately resulted in [the plaintiff's] termination and a 74-day unpaid suspension prior to his reinstatement, the investigation alone is nothing more than what is to be expected following allegations of institutional misconduct. Indeed, it arguably would have been reprehensible had SEPTA ignored the allegations . . . .").

[61] See also Outten v. Genesis Health Care, LLC, No. 13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014) ("[A] causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events . . . by the employee.").

Most importantly, at Plaintiff's second level grievance hearing, SEPTA detailed why Plaintiff and Jakira Jones received differing discipline in response to both altercations. As noted in Section II.A.7, supra, the SEPTA Office of Professional Responsibility Inspector explained:

> [A] review of the internal affairs investigations indicate that both [Plaintiff] and [Jakira] Jones were found to have violated department policy and issued written reprimands in connection with [the November 19 altercation]. At the same time, a concurrent investigation was being conducted with regards to a subsequent incident [on November 25]. In connection with that matter, the PBI found that [Plaintiff] was the only one who violated policy and issued him a one day suspension based on the progressive scale. Therefore, the Union's contention that there was a disparity is without merit since [Plaintiff] was the only one found to have violated policy [for the November 19 altercation].

(Id., Ex. 23 at 2.) In sum, the Inspector stated that "the discipline appear[ed] to be the culmination of [Plaintiff's] own conduct and behavior that he ha[d] yet to improve upon. Nothing presented in the investigations or the grievance hearings give the appearance of inequity or disparity." (Id.)

For these reasons, Plaintiff fails to raise a genuine dispute of material fact regarding whether there exists a causal connection between his protected activity and his suspension. Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's retaliation claims in Counts 3 and 8.[62]

## D. Aiding and Abetting under the PHRA

Count 9 of the Complaint is asserted against Defendant SEPTA and alleges aiding and abetting under the PHRA. (See Doc. No. 1 at 27.) Section 955(e) of the PHRA deems it unlawful "[f]or any person, employer, employment agency, labor organization or employe, [sic] to aid, abet,

---

[62] Plaintiff's retaliation claims also would fail because he has not established pretext for SEPTA's legitimate, nondiscriminatory reason for his suspension. To prove pretext, Plaintiff would have to show that his "protected activity was the 'but-for' cause of the adverse employment action." Larochelle, 769 F. App'x at 65. As shown in Section IV.C.2, supra, SEPTA's legitimate, nondiscriminatory reason for suspending Plaintiff was due to his third engagement in "inappropriate workplace behavior." (Doc. No. 30, Ex. 22.) Plaintiff cannot show—and nothing in the record suggests—that his three emails constituting protected activity were the "but-for" cause of his suspension.

incite, compel or coerce the doing of . . . an unlawful discriminatory practice[.]" 43 P.S. § 955(e). There is no violation, and thus no liability, under Section 955(e) "when there is no corresponding [PHRA] violation by an employer to aid and abet." Kaniuka v. Good Shepherd Home, No. 05-02917, 2006 WL 2380387, at *10 (E.D. Pa. Aug. 15, 2006).

In the instant Motion, Defendants aver that "SEPTA is entitled to summary judgment on [Plaintiff's] aiding and abetting claim under the PHRA because, independent of the lack of any substantive violation of the PHRA, an employer 'cannot aid and abet its own [alleged] unlawful conduct.'" (Doc. No. 27 at 68) (quoting Hewitt v. BS Transp. of Ill., LLC, 355 F. Supp. 3d 227, 239 (E.D. Pa. 2019)). The Court agrees. Since Plaintiff's PHRA discrimination and retaliation claims as asserted in Counts 7 and 8 fail as a matter of law, his PHRA aiding and abetting claim against SEPTA also fails. See Long v. Spalding Auto. Inc., 337 F. Supp. 3d 485, 494 (E.D. Pa. 2018) ("Plaintiff's Section 955(e) claim against [d]efendant fails because his discrimination claim under PHRA § 955(a) and his retaliation claim under PHRA § 955(d) also fail. Simply stated, [p]laintiff has alleged no discrimination or retaliation for [d]efendant to aid and abet.").

In his Response in Opposition, Plaintiff asks that he be afforded an opportunity to amend his Complaint "to cure the error of against which party he is moving." (Doc. No. 32 at 43.) Plaintiff seeks to assert the aiding and abetting claim against Boring and Gritsko, rather than SEPTA, on the ground that "[a] reasonable juror could conclude that Defendants Boring[] and Gritsko aided and abetted Defendant SEPTA's unlawful employment practices by . . . failing to oppose, adequately investigate, or take prompt remedial measures when they were informed of Defendant J[akira] Jones, Drayton and Singleton's discriminatory behavior[.]" (Id.)

The Federal Rules of Civil Procedure allow a plaintiff to amend their complaint with leave of court "when justice so requires." Fed. R. Civ. P. 15(a)(2). But a court "may deny leave to

amend . . . if a plaintiff's delay in seeking amendment is undue, . . . or [is] prejudicial to the opposing party." <u>Langbord v. United States Dep't of Treasury</u>, 832 F.3d 170, 188 (3d Cir. 2016) (quotations omitted) (quoting <u>Cureton v. NCAA</u>, 252 F.3d 267, 273 (3d Cir. 2001)). "Delay may become undue when a [plaintiff] has had previous opportunities to amend a complaint. . . . Thus, . . . the question of undue delay requires that [courts] focus on the [plaintiff's] reasons for not amending sooner." <u>Cureton</u>, 252 F.3d at 273 (citations omitted). Further, "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." <u>Bell v. City of Philadelphia</u>, 275 F. App'x 157, 160 (3d Cir. 2008) (internal quotations and citation omitted). At the summary judgment stage, the proper procedure for a plaintiff to amend current claims or assert new ones is to move to amend the complaint in accordance with Rule 15(a). <u>See</u> <u>id.</u> (citing <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Here, Plaintiff requests leave to amend his Complaint in his Response in Opposition to the instant Motion for Summary Judgment. He did not file a motion to amend, nor did he provide the Court with a proposed amended complaint. <u>See</u> <u>Ramsgate Ct. Townhome Ass'n v. W. Chester Borough</u>, 313 F.3d 157, 161 (3d Cir. 2002) (affirming district court's denial of leave to amend where the plaintiff "never filed a motion to amend, []or . . . provide[d] the district court with a proposed amended complaint.").[63] He also does not explain why he did not amend his Complaint

---

[63] <u>See</u> <u>also</u> <u>Cureton v. NCAA</u>, 252 F.3d 267, 273 (3d Cir. 2001) ("[T]he court may deny a request if the [plaintiff] fails to provide a draft amended complaint[.]"); <u>Calderon v. Kansas Dep't of Soc. & Rehab. Servs.</u>, 181 F.3d 1180, 1187 (10th Cir. 1999) ("Because a motion for leave to amend was never properly before it, the district court did not abuse its discretion in failing to address [plaintiff's] request for leave to cure deficiencies in her pleadings.").

sooner,[64] and appears to now seek leave to amend in anticipation of an adverse ruling on this claim.

See Mahar v. U.S. Xpress Enterprises, Inc., 688 F. Supp. 2d 95, 105 (N.D.N.Y. 2010) ("Leave to amend may be denied where the [plaintiff] appears to be raising a new claim in anticipation of an adverse ruling or to counteract a motion for summary judgment."). For all these reasons, Plaintiff will not be granted leave to amend his Complaint to reassert his aiding and abetting claim against Boring and Gritsko.[65]

Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's aiding and abetting claim.

---

[64] As the Court acknowledged in note 28, supra, in his Complaint, Plaintiff stated he "w[ould] seek leave to amend" all PHRA and PFPO claims on the ground that they "[were] still pending before the PHRC because less than one year ha[d] elapsed since PHRC assumed jurisdiction over Plaintiff's [c]harge[s]." (Doc. No. 1 ¶¶ 178-79, 181-82, 184-85, 188-89, 192-93, 196-97.) Despite this advance notice, Plaintiff never amended his Complaint.

[65] Even if the Court did allow Plaintiff to amend his Complaint, an aiding and abetting claim against Boring and Gritsko would also fail as a matter of law and be futile. See DeFeo v. Sill, 810 F. Supp. 648, 652 (E.D. Pa. 1993) (citing Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988)) ("A court may deny leave to amend when the proposed amendment would be futile, that is it would not cure the asserted defect.").

"[I]ndividual supervisory employee[s] can be held liable under an aiding and abetting accomplice liability theory . . . for [their] own direct act[s] of discrimination or for [their] failure to take action to prevent further discrimination by an employee under supervision." Harris v. Julia, No. 18-4502, 2018 WL 5316352, at *3 n.3 (E.D. Pa. Oct. 25, 2018) (quotations omitted) (quoting Davis v. Levy, Angstreich, Finney, Baldante, Ruhenstein & Coren P.C., 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998)). However, as Defendants note in their Motion, Plaintiff "does not believe that his supervisors, . . . Gritsko and . . . Boring, harbored any racial animus towards him." (Doc. No. 27 at 19); see also supra note 35. And as discussed in Section IV.A.5, supra, the record shows that—contrary to Plaintiff's assertions—Boring and Gritsko promptly responded to each of Plaintiff's informal complaints by launching internal investigations. (See Doc. Nos. 29, Ex. 8; 30, Exs. 9, 16, 18-20; 31, Ex. 27); see also Harris v. SEPTA, No. 2:07-3911, 2008 WL 11515855, at *3 n.4 (E.D. Pa. June 30, 2008) ("[T]he PHRA claims against the individual defendants could . . . be dismissed as a matter of law . . . . Although supervisory employees may be held liable under the PHRA for aiding and abetting discriminatory practices, plaintiff specifically states in his deposition that none of the individuals acted in a discriminatory manner.").

### E. Claims under Section 1981

Lastly, Counts 4, 5, and 6 of the Complaint are asserted against all Defendants and allege discrimination, hostile work environment, and retaliation claims under Section 1981. (See Doc. No. 1 at 19, 22-23.) In the instant Motion, Defendants argue that they are entitled to summary judgment on these claims because: (1) employees cannot assert Section 1981 claims against SEPTA; (2) Drayton, Singleton, and Jakira Jones cannot be liable under Section 1981; and (3) there is no evidence that Boring, Gritsko, and Captain Jones discriminated against Plaintiff in violation of Section 1981. (See Doc. No. 27 at 62-68.)

In his Response in Opposition, Plaintiff relies on the same argument he made in support of his aiding and abetting claim. He contends that he should be given leave to amend his Complaint to add claims under Section 1983 because "[t]he factual basis for Plaintiff's Section 1981 and Section 1983 claims are the same facts that form the prima facia [sic] case of Title VII race and color discrimination." (Doc. No. 32 at 36.) He further avers that the "original Complaint factually provides notice of Plaintiff's grounds for violations of Section 1983," and "the facts which support such causes of action are precisely the same as the facts which support Plaintiff's Section 1981 cause[s] of action." (Id. at 28, 30.)[66]

### 1. Defendants SEPTA, Drayton, Singleton, and Jakira Jones Are Not Liable under Section 1981

To start, Defendant is correct that Plaintiff's Section 1981 claims against SEPTA, Drayton, Singleton, and Jakira Jones cannot proceed. Regarding SEPTA, Plaintiff's Section 1981 claims fail because SEPTA cannot be sued under Section 1981.

---

[66] Plaintiff also argues in his Response in Opposition that Defendants "waived their right to assert that Section 1981 is improper" because they "fail[ed] to raise the defense until they submitted their motion for summary judgment." (Doc. No. 32 at 28.) This argument is without merit, however, because Defendants' assertion in their Motion for Summary Judgment is a challenge to the sufficiency of a claim.

Under Pennsylvania law, Defendant SEPTA is considered a state actor,[67] and the Third Circuit Court of Appeals has held that "Section 1981 does not provide a private right of action against state actors." Hill v. Southeastern Pa. Transp. Auth., No. 09-05463, 2010 WL 3490025, at *2 (E.D. Pa. Sept. 1, 2010) (citing McGovern v. City of Philadelphia, 554 F.3d 114, 121 (3d Cir. 2009)).[68] "[I]nstead, § 1983 provides the exclusive remedy against state [actors] for violation of rights guaranteed in, or by, § 1981." Foye v. SEPTA, No. 15-1036, 2017 WL 1150259, at *5 (E.D. Pa. Mar. 28, 2017); see also Poli v. SEPTA, No. 97-6766, 1998 WL 405052, at *11 (E.D. Pa. July 7, 1998) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731 (1989)) ("[T]he Supreme Court held that . . . the remedial provisions of section 1983 constitute the exclusive federal remedy for violations of rights enumerated in section 1981 by municipal entities . . . ."); Taylor v. Southeastern Pa. Transp. Auth., No. 06-3426, 2007 WL 1074887, at *2 (E.D. Pa. Apr. 5, 2007) ("SEPTA is treated as a municipal agency in determining its liability under § 1983.").

Therefore, because Plaintiff "can only bring a section 1981 claim against SEPTA via section 1983," Poli, 1998 WL 405052, at *12, and Plaintiff makes no mention of Section 1983 in his Complaint, his Section 1981 claims against SEPTA fail.[69]

---

[67] See Hill v. Southeastern. Pa. Transp. Auth., No. 09-05463, 2010 WL 3490025, at *2 (E.D. Pa. Sept. 1, 2010) (citing 74 Pa.C.S. §§ 1701-85; Poli v. SEPTA, No. 97-6766, 1998 WL 405052, at *12 (E.D. Pa. July 7, 1998)).

[68] See also Foye v. SEPTA, No. 15-1036, 2017 WL 1150259, at *5 (E.D. Pa. Mar. 28, 2017); Jordan, 2012 WL 4815414, at *16; Poli, 1998 WL 405052, at *12.

[69] And as discussed in Section IV.D, supra, Plaintiff will not be given leave to amend his Complaint because he improperly requested leave to amend through his Response in Opposition to the instant Motion. He did not file a motion to amend his Complaint and did not present any proposed amended complaint. And even if Plaintiff were given leave to amend to add Section 1983 claims, the claims would still fail. "SEPTA may be sued directly under Section 1983 for violations of Section 1981," but "it cannot be held liable for the acts of its employees under respondeat superior or any other theory of vicarious liability." Jordan, 2012

Regarding coworkers Drayton, Singleton, and Jakira Jones, Plaintiff's Section 1981 claims also fail. Under current Third Circuit precedent, individual liability exists under Section 1981 only if an individual intentionally infringes a plaintiff's Section 1981 rights or "authorize[s], direct[s], or participate[s] in the alleged discriminatory conduct[.]" Al–Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986). In Al–Khazraji, the Third Circuit came to this conclusion by explaining that Section 1981 "is a federal civil right remedy . . . in the nature of a tort remedy." Id. If "individual[s], including [] director[s], officer[s], or agent[s] of a corporation, may be liable for injuries suffered by third parties because of [their] torts," it logically follows that "directors, officers, and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981[.]" Id.

Despite the holding in Al–Khazraji, courts in the Third Circuit have still questioned whether non-supervisory employees can be held liable under Section 1981. In 2016, a court in this District pondered this uncertainty when addressing a Section 1981 claim against a non-supervisory coworker defendant. See Felder v. Penn Mfg. Indus., Inc., 182 F. Supp. 3d 203, 212 n.7 (E.D. Pa. 2016). The court wrote as follows:

> The law is somewhat unclear regarding individual liability against non-supervisory co-workers. The Third Circuit's reasoning for permitting individual § 1981 claims in Al–Khazraji is based on tort principles that hold directors, officers, and agents liable for their part in torts committed by a corporation. Al–Khazraji, 784 F.2d at 518. Since the record shows no evidence that [the individual defendant] had power to direct the activities of [the defendant company], this [Section 1981] claim stretches the limits of current doctrine.

WL 4815414, at *16 (citing Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691-94 (1987)). Therefore, to survive summary judgment on a Section 1983 claim against SEPTA, Plaintiff would have to show that SEPTA "implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated,' or acted 'pursuant to governmental 'custom' even though[] such a custom has not received formal approval through the body's official decision-making channels." Id. (citing McGovern v. City of Philadelphia, 554 F.3d 114, 121 (3d Cir. 2009); Monell, 436 U.S. at 690-91). Plaintiff makes no allegations about SEPTA's policies and/or practices and does not present any evidence of such.

Id. Even though the court opined on Section 1981 liability, it did not rely upon this to grant summary judgment for the individual defendant; instead, it granted summary judgment because Section 1981 liability "depends upon the existence of an underlying" Section 1981 violation and the plaintiff "failed to meet his burden of proving the first two elements" of a Section 1981 hostile work environment claim. Id. at 212.

In this case, the resolution of Plaintiff's Section 1981 claims against Drayton, Singleton, and Jakira Jones parallels that in Felder. The Court agrees with Felder that current Third Circuit precedent disfavors individual liability for non-supervisory coworkers like Drayton, Singleton, and Jakira Jones. Nevertheless, Plaintiff's Section 1981 claims against these three Defendants fail as a matter of law for the same reasons his Title VII claims fail.[70] See id.; Jordan, 2012 WL 4815414, at * 16 ("For the same reasons [the plaintiff] failed to make out a case of discrimination under Title VII and the PHRA, her Section 1981 claim must fail.").

For all these reasons, Plaintiff cannot prevail on his Section 1981 claims against SEPTA, Drayton, Singleton, and Jakira Jones.

### 2. Defendants Boring, Gritsko, and Captain Jones Did Not Violate Section 1981

Further, Defendant-supervisors Boring, Gritsko, and Captain Jones did not violate Section 1981. Section 1981 claims against supervisors "follow the same standards set out for employer liability under Title VII and the PHRA." Jordan, 2012 WL 4815414, at *16; see also Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999) ("[T]he legal standard for a § 1981 case is identical to the standard in a Title VII case."). Supervisors are liable under Section 1981 when they "intentionally cause an infringement of rights protected by Section 1981,

---

[70] See Sections IV.A-C, supra.

regardless of whether the [employer] may also be held liable." Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 648 (E.D. Pa. 2012), aff'd, 565 F. App'x 88 (3d Cir. 2014) (quoting Al–Khazraji, 784 F.2d at 518). Simply put, Section 1981 liability "contemplates intentional discrimination by a[n] individual defendant." Id.

Regarding Plaintiff's Section 1981 race discrimination claim, Plaintiff has not alleged or presented any evidence that Boring, Gritsko, or Captain Jones intentionally discriminated against him, and he specifically stated that Boring and Gritsko did not discriminate against him.[71] Therefore, the Section 1981 race discrimination claim fails as a matter of law. See id. ("The [p]laintiff has presented no evidence of intentional discrimination by either [defendant]. . . . Therefore, the claim for discrimination under Section 1981 against [the defendants] cannot stand."). Plaintiff's Section 1981 hostile work environment claim fails for the same reasons. Plaintiff does not allege nor present any evidence that Boring, Gritsko, or Captain Jones created a hostile work environment; rather, he complained to them about the alleged hostile environment created by Drayton, Singleton, and Jakira Jones.[72] (See Doc. Nos. 30, Exs. 10, 19; 33, Ex. E.)

Finally, Plaintiff's Section 1981 retaliation claim fails because there is no underlying discrimination or hostile work environment violation by Boring, Gritsko, or Captain Jones. See Est. of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) ("In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation.").

For all the above reasons, summary judgment is appropriate on Plaintiff's Section 1981 claims. Defendants SEPTA, Drayton, Singleton, and Jakira Jones cannot be held liable under

---

[71] See supra note 35.

[72] And as noted in Section IV.B, supra, Plaintiff cannot establish a prima facie case of a hostile work environment because the complained-of conduct was not severe and pervasive.

Section 1981, and Defendants Boring, Gritsko, and Captain Jones did not violate Section 1981.

Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's Section 1981 claims.

## V.    CONCLUSION

In sum, when viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, there is no genuine dispute of material fact that would preclude summary judgment in favor of Defendants.  A full review of the record shows that Plaintiff cannot establish a prima facie case of race discrimination, hostile work environment, or retaliation under Title VII and the PHRA, and aiding and abetting and Section 1981 claims.  Consequently, Defendants' Motion for Summary Judgment (Doc. No. 27) will be granted.  An appropriate Order follows.